Filed 7/29/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br> v.<br><br>NOAESE FALANIKO,<br><br>  Defendant and Appellant. | B259918<br><br>(Los Angeles County<br>Super. Ct. No. BA414815<br>consolidated with No. NA093971) |

APPEAL from a judgment of the Superior Court of Los Angeles County. James B. Pierce, Judge. Affirmed in part, reversed in part, and remanded with directions.

Donna L. Harris, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Michael Katz, Deputy Attorney General, for Plaintiff and Respondent.

_____

Noaese Falaniko challenges his convictions arising out of three separate shooting incidents for one count of first degree murder (Pen. Code,[1] § 187, subd. (a)—count 1), seven counts of attempted murder (§§ 664/187, subd. (a)—counts 2, 3, 4, 6, 7, 9, 10), and one count each of shooting at an occupied motor vehicle and at an inhabited dwelling[2] (§ 246—counts 5 & 8). The trial court sentenced appellant to an aggregate term of 330 years to life in state prison,[3] and imposed restitution and parole revocation fines on each count of conviction.

Appellant contends (1) his convictions on all counts of attempted murder must be reversed because the use of the disjunctive "or" in the attempted murder instruction permitted the jury to convict without finding specific intent as to each victim; (2) the erroneous inclusion of a reference to the natural and probable consequences theory of aiding and abetting liability requires reversal of all counts of conviction; (3) appellant's convictions should be reversed due to cumulative error; (4) the erroneous admission of appellant's involuntary statements to police, which were based on promises of leniency, mandates reversal; and (5) the trial court's failure to instruct the jury sua sponte on self-defense or imperfect self-defense requires reversal of the attempted murder convictions on counts 6 and 7.

We affirm appellant's convictions for murder in count 1, attempted murder in counts 4, 9 and 10, and shooting at an occupied motor vehicle and at an inhabited dwelling in counts 5 and 8. Instructional error compels us, however, to reverse and remand appellant's attempted murder convictions in counts 2, 3, 6, and 7. In addition, as

[1] Undesignated statutory references are to the Penal Code.

[2] The jury also found true all of the firearm, great bodily injury, and gang enhancement allegations.

[3] The sentence consisted of 25 years to life on the murder conviction (count 1) plus a consecutive 25 years to life for the section 12022.53, subdivision (d) enhancement on that count; 15 years to life, plus 25 years to life for the section 12022.53, subdivision (d) enhancement on each of the seven attempted murder convictions (counts 2, 3, 4, 6, 7, 9, 10); and stayed terms on the section 246 convictions under section 654 (counts 5 and 8).

appellant further contends and the Attorney General concedes, the trial court erred in imposing restitution and parole revocation fines on each count of conviction. We therefore reverse the trial court's restitution and parole revocation orders.

## FACTUAL BACKGROUND

*The South Street Shooting—Counts 8, 9, and 10*

On April 17, 2012, Edward Coral was with his brothers-in-law, Brandon and Ryan Alaimalo, on the front porch of the Alaimalo home on South Street in Long Beach. About 10:30 p.m., three men in black hoodies standing in the middle of the street started shooting at them. Police recovered seven .45-caliber shell casings and twenty-seven .762-caliber shell casings, consistent with an AK-47 rifle, at the scene.[4]

Coral was shot in the leg and hip, and suffered considerable nerve damage. Brandon was shot in the arm and chest. Ryan was not injured. The stucco and trim of the house showed several bullet strikes, and there were multiple bullet holes in the security screen and inside the house.

In recorded interviews with police following his arrest, appellant stated that he had been associated with the Crips gang, Westside Sons of Samoa ("SOS"), for three or four years, and was known within the gang as "Junior." Appellant told police that in April 2012, he agreed to help a fellow Westside SOS member known as "Sonic" retaliate against members of a rival Bloods gang, the Westside Pirus, for shooting at Sonic's house. Appellant knew Ryan Alaimalo and thought he was a member of the Westside Pirus gang.

Appellant told police that when he and Sonic arrived at the Alaimalo house there were four or five people outside, all wearing red flannel and red shoes, which confirmed

---

[4] At trial Coral could not identify any of the shooters, nor could he recall how many shooters there were. But immediately after the incident, he told police there were three men, and he was "50 to 75 percent sure" that the shooter with the AK-47 rifle was a six-foot one-inch light-skinned African-American known as "Day-Day," whose real name was Gary Ford.

3

appellant's belief that they were Westside Pirus.[5] Appellant and Sonic stood in the middle of the street about 15 to 20 feet away from the rival gang members and opened fire. Appellant fired about 30 rounds from an AK-47 with a 32-round magazine that he had purchased that day. He told police he stopped shooting because he was scared and later regretted what he had done.

### The Cherry Park Shooting—Counts 1 through 5

The night of July 21, 2012, Meki Siafega, Esther Vaafuti, Joe Foster, Branson Foster ("BJ"), and BJ's wife, Kelly Kese, gathered at Cherry Park in Long Beach for a family barbeque. The group arrived at the park about 5:00 p.m. just as another group, dressed mostly in red, was leaving.

About 11:30 p.m., Siafega heard a sound like firecrackers. A bullet struck him in the shoulder, and he ducked under a bench. Another bullet hit the side of his leg, and as he tried to crawl away, a third bullet struck the back of his leg.[6] Siafega saw two male shooters, one with long hair, the other with his hair in a bun. He could clearly see sparks from both guns, and they sounded like large caliber firearms. After the shooting had stopped, Siafega saw BJ lying motionless on the ground 30 to 50 feet away. BJ died as a result of multiple gunshot wounds, including fatal wounds to his head and abdomen.

Vaafuti was sitting on a bench when she heard what she thought were fireworks. Suddenly she felt a sharp pain as a bullet grazed her head, and she fell to the ground. The head wound required seven stitches, and she experienced migraine headaches every day after the incident.

Kese, who was eight and a half months pregnant, had gone to her car to charge her cell phone. She was sitting in the front seat of the car when two young men passed by on the sidewalk. Kese heard loud popping noises that sounded like firecrackers and turned

---

[5] Bloods gangs, including Westside Pirus, identify with the color red and wear red clothing, while Crips gangs such as SOS use the color blue to distinguish themselves.

[6] Siafega lost 60 percent of his right lung as a result of a fragmented bullet that pierced the lung, causing it to fill with blood.

to see the two young men who had passed her car standing on the sidewalk with guns in their hands, shooting at her family. As the two men were walking past Kese's car after the shooting, one of them fired his gun directly at Kese. The bullet missed Kese but struck the back door of her car. The shooters then ran away.

Police collected 14 expended .9-mm shell casings, one expended .45-caliber shell casing, and one .45-caliber live round from the scene. There was one bullet hole in Kese's car door, and police recovered a .45-caliber bullet from the vehicle.

Arlene Crisostomo was dating appellant in July 2012. On the day of the shooting, appellant and Crisostomo drove past Cherry Park, which was about four houses down the street from Crisostomo's home. Crisostomo noticed people in the park wearing red clothes whom she believed to be from a Bloods gang flash gang signs in their direction. It appeared to Crisostomo that appellant also saw the people throwing gang signs.

That night, Crisostomo and appellant were hanging out at Crisostomo's house. Approximately 10:45 p.m. appellant told Crisostomo he was going out with friends and she should pick him up when he called. Crisostomo left about 15 minutes later to go to a party in Orange County. Appellant called Crisostomo at 11:45 p.m. and asked her to pick him up in Long Beach. Crisostomo did as appellant asked, and they drove back to the party in Orange County. Appellant told Crisostomo he had been at Cherry Park when his friend, "Infant," shot at a group of people in the park. Appellant said he was just there to watch and provide backup.

Appellant was arrested in November 2012. During a conversation recorded when Crisostomo visited appellant in jail, Crisostomo agreed to give the police a false alibi and say that appellant was with Crisostomo at the party at the time of the Cherry Park shooting. Appellant said that he had told the police "the polyma clip" belonged to "Steven," whom he described as "half Black half Samoan with a fade." He added, "if they question you that's the . . . Steven I was talking about," and explained, "I can't [have] . . . the falima clip coming back to me, hell no I'm straight. I'm trying to throw that shit off of me. I already got like gang of shit coming back to me."

5

Crisostomo gave the false alibi to police, but when they accused her of lying, she revealed she had gone to the party alone and picked appellant up later. When appellant offered the alibi to police, he told them he had learned from another jail inmate that a Samoan had been shot at Cherry Park. He also told police he had later overheard two SOS gang members, "Infant Widdit" and "Blackeye," admit to committing the Cherry Park shooting. But appellant subsequently bragged to Crisostomo that he had "made up a nigga named Blackeye" when he spoke to the police about the Cherry Park shooting.

### The Shooting at the Fantasy Gold Club—Counts 6 and 7

On November 3, 2012, Thomas Sablan was working as a deejay at the Fantasy Gold Club in Harbor City. Around midnight, a man wearing a hoodie entered the club and motioned for Sablan to go outside. Sablan did not know the person and stayed inside. Sablan then heard about six gunshots. As he attempted to escape the gunfire, a bullet struck the bottom of his left calf and he chipped a tooth on a table. Uchenna Ojinna, who was working security in the club that night, suffered gunshot wounds to his leg and abdomen. Surveillance video from the club showed the shooter firing into the building.

In his interview with police, appellant explained that "a while back" before the Fantasy Gold Club shooting, some members of the Westside Pirus gang had chased him and beat him up. Appellant went to the club and heard two Samoans "saying Blood and stuff," which meant they were Westside Pirus. Wanting to scare them, appellant called them outside. When they came out, appellant fired his gun three times.[7]

---

[7] The transcript of the interview reflects that appellant stated that the two Samoans "came out and opened fire." But in the audio recording of the interview played for the jury, appellant can be heard to say, "They came out and *I just* opened fire." The trial court admonished the jury that the audio recording was controlling, not the transcript.

## DISCUSSION

### I. *The Attempted Murder Instruction*

The trial court instructed the jury with CALCRIM No. 600 on attempted murder, which it modified to apply to all seven counts of attempted murder and included a "kill zone" theory of liability:

"The defendant is charged in Counts 2, 3, 4, 6, 7, 9 and 10 with attempted murder.

"To prove that the defendant is guilty of attempted murder, the People must prove that:

"1. The defendant took at least one direct but ineffective step toward killing another person;

"AND

"2. The defendant intended to kill a person. [¶] . . . [¶]

"A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.'

"In order to convict the defendant of the attempted murder of Meki Siafega as charged in count 2, Esther Vaafuti as charged in count 3, and Kelly Kese as charged in count 4, the People must prove that the defendant not only intended to kill a person, but also either intended to kill Meki Siafega, Esther Vaafuti *and/**or*** Kelly Kese, *and/or* intended to kill everyone within the kill zone.

"In order to convict the defendant of the attempted murder of Uchenna Ojinna as charged in count 6 and Thomas Sablan as charged in count 7, the People must prove that the defendant not only intended to kill a person, but also either intended to kill Uchenna Ojinna *and/**or*** Thomas Sablan *and/or* intended to kill everyone within the kill zone.

"In order to convict the defendant of the attempted murder of Edward Coral as charged in count 9 and Brandon Alaimalo as charged in count 10, the People must prove that the defendant not only intended to kill a person, but also either intended to kill Edward Coral *and/**or*** Brandon Alaimalo *and/or* intended to kill everyone within the kill zone.

"If you have a reasonable doubt whether the defendant intended to kill a person or intended to kill a person by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Meki Siafega, Esther Vaafuti and Kelly Kese; **and/or** Edward Coral and Brandon Alaimalo; **and/or** Uchenna Ojinna and Thomas Sablan." (Italics, underscoring & boldface added.)

Appellant challenges the instruction on the ground that the use of the disjunctive "or" (underlined and in bold above) permitted the jury to convict for attempted murder without finding appellant had the requisite intent to kill each victim. We agree, and find the error prejudicial beyond a reasonable doubt as to counts 2, 3, 6, and 7.[8]

### A. *Instructional Error*

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Superior Court (Decker)* (2007) 41 Cal.4th 1, 7.) Our Supreme Court has described the critical distinction between the mental states required for attempted murder and murder: "Attempted murder requires express malice, i.e., intent to kill. Implied malice—a conscious disregard for life—suffices for murder but not attempted murder." (*People v. Stone* (2009) 46 Cal.4th 131, 139–140 (*Stone*); *People v. Bland* (2002) 28 Cal.4th 313, 327–328 (*Bland*); *People v. Cardona* (2016) 246 Cal.App.4th 608, 613.)

Two distinct doctrines may come into play when a defendant attacks multiple victims, depending on whether the crimes charged are murder or attempted murder. Under the theory of transferred intent, "a person who intends to kill is guilty of the murder of everyone actually killed, whether or not the person intended to kill each one."

---

[8] Respondent contends that appellant forfeited any claim of error with regard to the attempted murder instruction because he did not request that the court modify or amplify the instruction. The assertion lacks merit. Appellant argued the instruction was overly broad and would permit conviction for attempted murder on a theory of transferred intent, just as he argues on appeal. The trial court then gave the instruction over appellant's objection. A clearer preservation of the issue for appeal would be difficult to imagine.

(*Stone*, *supra*, 46 Cal.4th at p. 136; *Bland*, *supra*, 28 Cal.4th at pp. 323–324.)  But because "[t]he crime of attempt sanctions what the person intended to do but did not accomplish, not unintended and unaccomplished potential consequences," the shooter who fails to kill the unintended victim cannot be convicted of attempted murder under a theory of transferred intent.  (*Bland*, *supra*, at pp. 326–327; *Stone*, *supra*, at p. 136.)

The defendant who targets a specific person by firing a flurry of bullets into a crowd may nevertheless be convicted of attempted murder if the evidence shows he intended to kill everyone in the victim's vicinity in order to kill the intended victim.  In such a scenario, the defendant is liable for attempted murder under a "kill zone" or "concurrent intent" theory rather than transferred intent.  (*Bland*, *supra*, 28 Cal.4th at pp. 329, 330–331; *People v. Cardona*, *supra*, 246 Cal.App.4th at pp. 613–614.)  The Supreme Court has also held the kill zone theory to apply even if the defendant has no specific target in mind but shoots to kill everyone in a defined area, reasoning that "[a]n indiscriminate would-be killer is just as culpable as one who targets a specific person." (*Stone*, *supra*, 46 Cal.4th at p. 140.)  The kill zone theory is not a one-size-fits-all shortcut to establishing the requisite mental state for attempted murder, however.  Indeed, the Supreme Court has emphasized that the theory is not a legal doctrine requiring special jury instructions at all, but rather, "is simply a reasonable inference the jury may draw in a given case."**9**  (*Bland*, *supra*, 28 Cal.4th at p. 331, fn. 6; *People v. McCloud*, *supra*, 211 Cal.App.4th at pp. 802–803.)

A conviction for attempted murder under a kill zone theory requires evidence that the defendant created a kill zone; that is, while targeting a specific person he attempted to kill everyone in the victim's vicinity, or he indiscriminately sought to kill everyone in a particular area without having any primary target.  (*People v. McCloud*, *supra*, 211

---

**9** For this reason, "the Supreme Court has repeatedly explained that jury instructions on the kill zone theory are *never* required.  (*Stone*, *supra*, 46 Cal.4th at pp. 137–138; [*People v.*] *Smith* [(2005)] 37 Cal.4th [733,] 746; *Bland*, *supra*, 28 Cal.4th at p. 331, fn. 6.)"  (*People v. McCloud* (2012) 211 Cal.App.4th 788, 802.)

Cal.App.4th at p. 798.) In addition, before a defendant may be convicted of attempted murder under a kill zone theory, the evidence must establish that all the victims were actually in the kill zone.

The trial court in this case gave only one attempted murder instruction, which permitted the jury to convict on all seven attempted murder charges based on a kill zone theory of liability. But substantial evidence did not support conviction under the kill zone theory on counts 4, 6, or 7. Specifically, as to counts 6 and 7—the Fantasy Gold Club shooting— there was no evidence that appellant created a "kill zone," much less that he intended to kill everyone who might have been in it. Thus, while the surveillance video showed the shooter firing into the building, there was no evidence from which the jury could reasonably infer that appellant specifically intended to kill every single person in the area, or any evidence that Sablan and Ojinna were both in the "kill zone" when they were shot. As to count 4, the charge of attempted murder of Kese in the Cherry Park shooting, while there was evidence that appellant and his cohort created a kill zone in the park, the evidence also established that Kese—who was sitting in her car some distance away—was clearly not in it. A court errs when it instructs on a theory which has no application to the facts of the case. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) Because the record in this case lacks substantial evidence to support application of the kill zone theory to counts 4, 6, and 7, we conclude the trial court erred in so instructing the jury as to these charges.[10]

The instruction also misstated the law. Even if the jury rejected the kill zone inference, the court's modification of the instruction with the disjunctive "or" permitted the jury to convict on all charges of attempted murder in each of the three shooting incidents without finding specific intent as to each victim individually. " ' "[G]uilt of attempted murder must be judged separately as to each alleged victim." ' [Citation.] '[T]his is true whether the alleged victim was particularly targeted or randomly chosen.' "

---

[10] Our conclusion in this regard pertains solely to the sufficiency of the evidence to support instruction on the kill zone theory in counts 4, 6, and 7.

(*People v. Perez* (2010) 50 Cal.4th 222, 230.)  Accordingly, if the jury rejected the inference supplied by the kill zone theory, it would then have to find appellant specifically intended to kill each person individually in order to convict on all charges of attempted murder.  But the instruction given here does not require a finding of specific intent as to each victim.  Instead, grouping the victims by the three separate shooting incidents, the instruction included the disjunctive "or" between the names of the individuals, thereby permitting the jury to convict on all charges of attempted murder in each shooting incident based on a finding of intent to kill only one of the victims in the incident.  The trial court erred in giving the instruction as modified.

### B. *Prejudice*

The question remains whether the errors require reversal on all counts of attempted murder.  "Instructional error regarding the elements of the offense requires reversal of the judgment unless the reviewing court concludes beyond a reasonable doubt that the error did not contribute to the verdict."  (*People v. Chun* (2009) 45 Cal.4th 1172, 1201; *Chapman v. California* (1967) 386 U.S. 18, 24.)  On the other hand, to the extent the court erred in instructing on a theory unsupported by the evidence, the error is one of state law, "subject to the reasonable probability standard of harmless error under *People v. Watson* (1956) 46 Cal.2d 818, 836–837."  (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 214; *People v. Debose* (2014) 59 Cal.4th 177, 205–206 [error of instructing on inapplicable theory subject to *Watson* review].)

As set forth above, the evidence did not support instruction on a kill zone theory as to the attempted murder of Kese in count 4.  We therefore review the court's erroneous inclusion of count 4 in the kill zone instruction under the *Watson* harmless error standard.  Uncontroverted evidence that appellant or his cohort fired directly at Kese supports a finding of specific intent to kill her.  Accordingly, because any reasonable jury would have convicted on the charge of attempted murder in count 4 without reliance on a kill zone theory, we conclude that the instructional error as to count 4 was harmless.  (*People v. Watson*, *supra*, 46 Cal.2d at pp. 836–837.)

11

To the extent the instruction misstated the law regarding the intent element of the attempted murder charges, however, we must reverse unless we conclude beyond a reasonable doubt that the error did not contribute to the verdicts. (*People v. Chun*, *supra*, 45 Cal.4th at p. 1201.) And as to counts 2 and 3 arising from the Cherry Park shooting, and counts 6 and 7 based on the Fantasy Gold Club shooting, we cannot conclude that the use of the disjunctive in instructing on the requisite intent for attempted murder was harmless beyond a reasonable doubt.

The disjunctive wording of the instruction permitted conviction for the attempted murders of all three victims of the Cherry Park shootings with a finding of specific intent to kill only one of those victims. Thus, if the jury disregarded the kill zone portion of the instruction, and found a specific intent to kill Kese, it could have convicted for the attempted murders of Siafega (count 2) and/or Vaafuti (count 3) without separate findings that appellant intended to kill each of them. Given this clear path to improper attempted murder convictions on counts 2 and 3 arising from the Cherry Park shootings, we cannot conclude that "the guilty verdict actually rendered in *this* trial was surely unattributable to the error." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.)

With regard to the Fantasy Gold Club shooting, as discussed above, there was scant evidence to support attempted murder convictions as to both victims under a kill zone theory. Thus, while the evidence did not support an inference of intent based on a kill zone, the disjunctive wording of the instruction nevertheless permitted conviction for attempted murder without a separate finding of intent as to each of the victims. Under these circumstances, we cannot find beyond a reasonable doubt that the erroneous instruction did not contribute to the attempted murder verdicts in counts 6 and 7.

The South Street shooting is a different matter. The evidence as to that shooting, which represents a classic kill zone scenario, was undisputed and overwhelming. Appellant confessed to his participation in this incident, wherein men in black hoodies stood in the middle of the street in front of the Alaimalo home and opened fire. Thirty-four shell casings were recovered, and two of the three victims were seriously injured. It could not be determined which of the victims, if any, was the primary target. Even

though the instruction's use of the disjunctive as to each of the victims was erroneous, we conclude the error was harmless beyond a reasonable doubt as to the South Street shooting because the jury could properly convict under the kill zone theory.

**II.** *Reference to the Natural and Probable Consequences Theory of Aiding and Abetting Liability*

Appellant contends the trial court's inclusion of bracketed language from CALCRIM No. 400, referring to the natural and probable consequences doctrine, mandates reversal of his convictions because the instruction did not require the prosecution to prove that the nontarget offenses were reasonably foreseeable. We conclude that the court's error in including this language was harmless.

The prosecution relied in part on the theory that appellant aided and abetted other individuals in the commission of the South Street and Cherry Park shootings. Accordingly, the trial court instructed the jury on the general principles of criminal liability based on aiding and abetting, and included the optional bracketed material from the form instruction: "Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime."[11] (CALCRIM No. 400.)

The bench notes to CALCRIM No. 400 state that the court should instruct with the bracketed language if the prosecution relies on a theory that any of the charged offenses were committed as a natural and probable consequence of a target offense. (See *People v. Chiu* (2014) 59 Cal.4th 155, 161 [" ' "A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime" ' "].)

---

[11] The court also instructed the jury with CALCRIM No. 401 (Aiding and Abetting: Intended Crimes), but did not give CALCRIM No. 402 (Natural and Probable Consequences Doctrine (Target and Non-Target Offenses Charged)) or CALCRIM No. 403 (Natural and Probable Consequences (Only Non-Target Offense Charged)), as recommended when instructing on the natural and probable consequences doctrine.

The prosecution here did not rely on the natural and probable consequences doctrine, nor was there any evidence in this case that the perpetrator committed another crime that was a natural and probable consequence of the intended offense. The additional language thus amounted to " 'an "abstract" instruction, i.e., "one which is correct in law but irrelevant." ' " [Citations.] Giving an instruction that is correct as to the law but irrelevant or inapplicable is error. [Citation.] Nonetheless, giving an irrelevant or inapplicable instruction is generally ' "only a technical error which does not constitute ground for reversal." ' " (*People v. Cross* (2008) 45 Cal.4th 58, 67.) Such error does not implicate the defendant's constitutional rights and is subject to harmless error review under *People v. Watson*, *supra*, 46 Cal.2d at page 837.

Appellant fails to demonstrate any possible prejudice that could have resulted from the court's error. He neglects to specify any nontarget offense that the perpetrator actually committed for which appellant was found guilty as an aider and abettor. Nor does he identify any specific circumstances under which the jury might have convicted appellant for aiding and abetting "other crimes that occurred during the commission of the first crime." Instead, he asserts reversal is required "because the prosecutor failed to establish either that appellant was the actual shooter or that appellant intended to kill each and every one of the named victims." He also cites the jury's request for the definition of "proximate cause" in count 1 as evidence "that at least some jurors were struggling with the fact that the prosecutor failed to prove that appellant . . . fired the fatal shot." And he claims that the instructional error permitted the jury to convict solely on the basis of "a finding that appellant aided and abetted someone else in the commission of a gang offense."

None of these contentions persuades us that the error allowed the jury to convict appellant under the natural and probable consequences theory of aiding and abetting or any incorrect legal theory.[12] We therefore conclude, as did Justice Mosk in his

---

[12] Because we conclude that the jury did not convict under a natural and probable consequences theory, we also reject appellant's contention that his first degree murder

14

concurring opinion in *People v. Prettyman*, that "[t]he instruction on the [natural-and-probable-consequence] rule must have been understood, and dismissed, by the jury as mere surplusage.  [Citation.]  It cannot be held to have resulted in a 'miscarriage of justice.'  (Cal. Const., art. VI, § 13.)  It was too insignificant to have affected the outcome within a 'reasonable probabilit[y],' as required by *People* v. *Watson* (1956) 46 Cal.2d 818, 837."  (*People v. Prettyman* (1996) 14 Cal.4th 248, 280 (conc. opn. of Mosk, J.).)

## III.    *Appellant's Statements to the Police*

Appellant contends that promises of leniency rendered his statements to police involuntary, and the erroneous admission of those statements requires reversal.  We disagree.

Appellant had several interviews with police, two of which were recorded.  In unrecorded sessions, appellant spoke with Officers Calvert and Lyon from the Long Beach gang detail, and Detective Goodman from the Long Beach homicide unit.  Subsequently, appellant spoke with Detective Goodman and Officer Calvert in a recorded interview in which he acknowledged he had been advised of his *Miranda*[13] rights, understood them, and had signed a written waiver.[14]  In the recorded interview, appellant acknowledged that after he had signed the waiver, he had spoken with police about a shooting in his area and a homicide at Cherry Park.  Appellant then gave the police his account of his whereabouts on the day of the Cherry Park shooting and how he had learned the details of that shooting.  Appellant also described his participation in the South Street shooting, admitting he had fired some 30 rounds from his own AK-47 to help a fellow gang member settle a score with a rival Bloods gang.  At the end of that interview, appellant confirmed that the police had made no promises or threats to him,

---

conviction must be reversed and reduced to second degree under *People v. Chiu*, *supra*, 59 Cal.4th 155.

[13] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

[14] According to Detective Goodman, the recorded interview was a repeat of the unrecorded conversation.

15

and that all the detectives and officers with whom he had spoken had been respectful toward him and had treated him fairly.

Officer Hayes from the Los Angeles Police Department Harbor Gang Division conducted the second recorded interview of appellant with Officer Calvert. Officer Hayes asked appellant a series of background questions, and then stated, "The reason you're here is because you've been identified in a crime." He added, "[Officer] Calvert said you were nothing but cooperative with him yesterday. From my experience, it's in your best interest to be cooperative with us today here, okay?" After reading appellant his *Miranda* rights, Officer Hayes said, "Remember, I told you it's in your best interest to be cooperative, all right?" Shortly thereafter, Officer Hayes told appellant, "You were identified in a shooting in Harbor City. Do you want to tell me anything that you may have been involved in?" Appellant replied that he saw "some stuff," to which the officer responded, "I have a feeling you know what I'm talking about, and I'm just hoping that you'll be honest with me, because it shows that you're being cooperative with our investigation. And with everything you got going on, the judge is going to look at that and say, you know, that you're being cooperative." Officer Calvert added that they wanted appellant to be "honest about exactly what happened," but they were not going to tell him what to say.

The officers questioned appellant about the Fantasy Gold Club shooting. Appellant gave them his account of the shooting and told the officers how he had obtained the gun. Officer Calvert replied, "You sure? You remember the whole honesty thing? I mean, if that's the God's honest truth then it is, but if it's not the God's honest truth, don't start doing that. You got to tell the truth, for real for real." Near the end of the interview, Officer Hayes told appellant, "I appreciate your honesty," and, "You've been honest with [Officer Calvert]. And I'd just like to say thank you for being honest."

Ruling on the motion to exclude the interviews, the court found that the officers thoroughly advised appellant of his rights and noted that appellant had confirmed he had been treated fairly and had received no promises of leniency. The court denied the

16

motion to suppress appellant's statements to police, concluding they had been voluntarily made.

"An involuntary confession may not be introduced into evidence at trial. (*Lego v. Twomey* (1972) 404 U.S. 477, 483.) The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made. (*Id.* at p. 489; *People v. Williams* (1997) 16 Cal.4th 635, 659.) In determining whether a confession was voluntary, ' "[t]he question is whether defendant's choice to confess was not 'essentially free' because his [or her] will was overborne." ' (*People v. Massie* (1998) 19 Cal.4th 550, 576.) Whether the confession was voluntary depends upon the totality of the circumstances. (*Withrow v. Williams* (1993) 507 U.S. 680, 693–694; *People v. Massie*, *supra*, 19 Cal.4th at p. 576.)" (*People v. Carrington* (2009) 47 Cal.4th 145, 169.) We review the trial court's finding of voluntariness independently, while accepting the trial court's findings with respect to the circumstances surrounding the confession if supported by substantial evidence. (*Ibid.*)

" 'It is well settled that a confession is involuntary and therefore inadmissible if it was elicited by any promise of benefit or leniency whether express or implied.' [Citation.] 'In terms of assessing inducements assertedly offered to a suspect, " '[w]hen the benefit pointed out by the police . . . is merely that which flows naturally from a truthful and honest course of conduct,' the subsequent statement will not be considered involuntarily made." ' " (*People v. Tully* (2012) 54 Cal.4th 952, 993; see also *People v. Hill* (1967) 66 Cal.2d 536, 550 [no implicit promise of leniency in officer's urging accused to "help himself" by confessing].)

Courts have made clear that investigating officers may freely encourage honesty and lawfully discuss any " 'naturally accru[ing]' " benefit, advantage or other consequence of the suspect's truthful statement. (*People v. Ray* (1996) 13 Cal.4th 313, 340; *People v. Williams* (2010) 49 Cal.4th 405, 444 ["Absent improper threats or promises, law enforcement officers are permitted to urge that it would be better to tell the truth"]; *People v. Boyde* (1988) 46 Cal.3d 212, 238 ["Mere advice or exhortation by the police that it would be better for the accused to tell the truth, when unaccompanied by

17

either a threat or a promise, does not . . . make a subsequent confession involuntary"].)

In *People v. Vance* (2010) 188 Cal.App.4th 1182, officers told the defendant, " '[w]e are here to listen and then to help you out' " and " 'the court . . . wants to know what the real story is and you're the only one that can provide that.' " (*Id.* at p. 1212.) The court found the only benefit promised was the peace of mind from doing the right thing and characterized the officers' statements as "brief and bland references" which do not rise to the level of coercion or promises of leniency. (*Ibid.*) Similarly, courts have found no promises of leniency where police offer to tell the prosecutor about a defendant's cooperation, which will benefit him in the judicial process. (*People v. Ramos* (2004) 121 Cal.App.4th 1194, 1200; *People v. Higareda* (1994) 24 Cal.App.4th 1399, 1409; see also *U. S. v. Coleman* (9th Cir. 2000) 208 F.3d 786, 791 [agents' statement to induce defendant's cooperation, that if he knew anything he should tell them and they would ask " 'the prosecutor to give [him] little or no time,' " was insufficient to establish involuntariness of confession].)

We find no implicit threats or promises of leniency in the officers' exhortations for honesty and cooperation from appellant in this case. Nor do we view the statement that the judge would consider appellant's cooperation with the investigation as any promise of leniency. In short, such "brief and bland references upon which [appellant] has seized do not push this case over the forbidden line of promised threats or vowed leniency," which would render appellant's confessions to police involuntary. (*People v. Vance*, *supra*, 188 Cal.App.4th at p. 1212.)

## DISPOSITION

The judgment on counts 2, 3, 6, and 7 is reversed and the matter is remanded to the trial court for retrial. The order imposing a restitution fine and a parole revocation fine as to each count of conviction is reversed. In all other respects, the judgment is affirmed.

CERTIFIED FOR PUBLICATION.


LUI, J.

We concur:


ROTHSCHILD, P. J.


CHANEY, J.

19