Filed 7/11/22

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C093173 |
| Plaintiff and Respondent, | (Super. Ct. No. LODCRFECOD20200006207) |
| v. | |
| ANTHONY SCOTT ZABELLE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Joaquin County, Linda L. Lofthus, Judge. Affirmed in part and reversed in part.

Erica Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Ross K. Naughton, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant Anthony Scott Zabelle guilty of second degree robbery. It also found true the allegation that he inflicted great bodily injury during the commission of the robbery.

On appeal, defendant challenges his conviction and resulting sentence for two reasons. First, he contends the trial court wrongly admitted a confession he made to officers following an allegedly coercive interrogation. Defendant bases his argument on two statements from the officers. In the first, one officer said, "[T]here is a very critical time where you can earn possibly some consideration." In the second, the same officer said, "Sometimes" it "works in your favor" to be "honest," "up front," and "admit[]. . . your involvement"; "[s]ometimes it doesn't." Defendant characterizes these statements as promises of leniency that improperly induced him to confess. Second, based on a recent amendment to Penal Code section 1170 that became effective January 1, 2022, defendant asserts we should remand the case to the trial court for resentencing consistent with the current statutory text.[1]

We find defendant's second argument, though not his first, persuasive. Starting with his claim concerning his allegedly coerced confession, defendant has at most shown an officer informed him that his full cooperation might be beneficial in an unspecified way. But as case law makes clear, that is not enough to show improper coercion. Turning to his next claim premised on section 1170's new language, we agree remand for resentencing is appropriate. We thus remand to the trial court for resentencing consistent with section 1170's current text and otherwise affirm.

## I. BACKGROUND

Most of the facts relevant to this opinion are indisputable and documented on video. Defendant approached a man named Scott from behind, hit him over the head

---

[1] Undesignated statutory references are to the Penal Code.

2

with a glass bottle, and, after Scott fell to the ground, stomped on his head. Defendant and an accomplice then rifled through Scott's pockets, with both taking some of Scott's possessions. Although not clear from the video evidence, defendant later testified that he took Scott's pipe and knife, and his accomplice took Scott's wallet. Defendant added that his accomplice later shared the wallet's contents, about $100, with him. In defendant's telling, Scott earlier induced defendant to give him the $100 based on a false promise and defendant approached Scott intending to recover this money. A police officer later found Scott lying on his back in the alley where the attack took place, appearing either to be unconscious or asleep. Another officer arrived soon after and noticed a cut about two-inches long on Scott's head.

Shortly after these events, two officers stopped defendant and questioned him at a motel. The relevant part of the conversation, which was recorded on video and preceded by a warning under *Miranda v. Arizona* (1966) 384 U.S. 436, went as follows according to the transcript:

"Q: Do you understand your rights?

"A: I do.

"P: Okay.

"A: I didn't rob nobody though.

"Q: There is—there is a very critical time where you can earn possibly some consideration.

"Q1: Okay[.] [T]here's video of the whole incident and—and—and it goes—Calvin's giving you up[.] [Y]ou['re] right [in] front, you filled up[,] you go right to your room[,] and then you change your clothes[.] [Y]ou were wearing a Washington Nationals hat. Come on[,] man. I—let's just. . . .

"Q: So how—how—how much money did Calvin give you?

"A: I have $41 in my pocket.

"Q1: That's—did he give you that $41?

3

"A: Can we go up there[?]

"Q1: Can we go up?

[Defendant and the officers go upstairs to defendant's motel room.]

"Q: Anybody else in here?

"Man: (Unintelligible)

"Q: All right[.] [S]tand right there.

:Q1: (Unintelligible).

"Man: Close the door[.]

"[A:] He was on the outside (unintelligible). Okay. You know what I mean. Like this and that. It is what it is. I mean but. . . Fuck[,] man.

"Q1: I knew it was you and Calvin[,] so.

"Q: How much—how much money did he give you?

"A: $41.

"Q: $41. And that was from what?

"A: It was just from the—the dude.

"Q: From that dude? What did you do to that dude?

"A: Um, we got into it. I mean that's about it.

"Q: You and the dude got into it.

"A: We had words this and that. ([U]nintelligible) we got into it. (unintelligible) the money—he gave me money.

"Q: Explain to me—just—I—I wasn't there.

"A: I know but [unintelligible] use against me. You read me my rights.

"Q: Yeah, I did.

"A: That's the thing. ([U]nintelligible) y'all[']s situation he trying[] to deal with that cause it is what is[.] I mean[,] [y]ou know how it goes. Next time you see it walks off (unintelligible). You know, I already got enough issues as it is with people. ([U]nintelligible) because I ain't from out here.

4

"Q: No. I got it. But—but here's the deal. You know we can't make any guarantees but sometimes being honest and up front, admitting your involvement and—and what you did can go a[ ]ways to showing your remorse and—

"A: Yeah[,] I know but I mean I'd rather . . .

"Q: Sometimes that works in your favor. Sometimes it doesn't.

"A: ([U]nintelligible) dough. ([U]nintelligible)

"Q: Okay. How'd you get the blood on your shoes?

"A: I don't know. ([U]nintelligible.) I don't know exactly how.

"Q: Bro.

"A: I know. Come on[,] man.

"Q: His—his head got stomped.

"A: Okay, I mean . . .

"Q: All right. Is that gonna be his blood?

"A: Hey[,] I don't know. Yeah. Fuck[,] man.

"Q: Is that going to be his blood?

"A: Probably.

"Q: Probably? Okay. All right. Because we . . .

"A: Search me, search me. ([U]nintelligible] I'm not trying to do all of this. It was a mistake or somethin' stupid to do[,] you know what I mean[.] [L]ike[,] we just—we just. . .

"Q1: Look[,] I can't just let you walk from this but—

"A: Then don't tell me give you somethin['] (unintelligible).

"Q: Here—here—here—[n]o. [N]o—no—no—no.

"Q1: ([U]nintelligible).

"Q: Hey, hey. Straight up. Look at me for a second, okay? All right? This is the way it works. All right. You gotta go in, you gotta get booked for this because the nature of your crime right now we can't let you walk. Okay? Look at me.

5

"A:  I know—I'm stupid[,] man.  Fuck."

After being charged with second degree robbery with a great bodily injury enhancement based on these events, defendant moved to suppress his confession to the officers.  He argued that his confession was unlawfully coerced based on one of the officer's promises of leniency.  He pointed, in support, to two of the officer's statements: First, the officer's statement that "[t]here is a very critical time where you can earn possibly some consideration"; and second, the officer's statement that "sometimes" it "works in your favor" to be "honest," "upfront," and "admit[]. . . your involvement"; "sometimes it doesn't."  The trial court denied the motion, concluding "that this interrogation was not coercive."

A jury later found defendant guilty of second degree robbery (§ 211).  It also found true the allegation that defendant inflicted great bodily injury on Scott during the commission of the robbery (§ 12022.7, subd. (a)).  The trial court sentenced defendant to eight years in prison: five years for the robbery and three consecutive years for the great-bodily-injury enhancement.

Defendant timely appealed.

## II.  DISCUSSION

*A.  Defendant's Confession*

Defendant first contends the trial court wrongly admitted his confession to the officers.  He reasons that one of "the officer[s] coerced [his] confession with implied promises that he would receive consideration and leniency if he admitted to the allegations against him."  He also asserts that the trial court's failure to exclude this testimony was prejudicial.  The Attorney General, in turn, contends defendant's claim fails for three reasons.  First, his claim fails because he cannot show "that anything the police said could reasonably be taken as a promise."  Second, his claim fails because he cannot show "that any supposed promise was the motivating cause of anything he said."  And third, even if the confession should have been excluded, his claim still fails because

6

"any error was harmless beyond a reasonable doubt." We conclude defendant's confession was properly admitted.

Although, of course, not all incriminating confessions are inadmissible, officially coerced confessions violate the Fifth Amendment's privilege against compulsory self-incrimination and the guarantee of due process. (See *Withrow v. Williams* (1993) 507 U.S. 680, 688 [the Fifth Amendment bars the admission of "involuntary confessions made in response to custodial interrogation"]; see also *id.* at p. 689 [the Fifth Amendment privilege against self-incrimination is incorporated in the Fourteenth Amendment and thus applies to the states].) "This is so not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth." (*Rogers v. Richmond* (1961) 365 U.S. 534, 540-541.)

Courts, as relevant here, will deem a confession to be " 'involuntary and therefore inadmissible if it was elicited by any promise of benefit or leniency whether express or implied. [Citations.] However, mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary. . . . Thus, "[w]hen the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct," the subsequent statement will not be considered involuntarily made. [Citation.] On the other hand, "if . . . the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible." ' " (*People v. Holloway* (2004) 33 Cal.4th 96, 115 (*Holloway*).)

7

In this case, in arguing his confession was improperly coerced, defendant focuses on two statements from one of the interrogating officers. In the first, the officer vaguely said, "[T]here is a very critical time where you can earn possibly some consideration." And in the second, the same officer said, "[W]e can't make any guarantees but sometimes being honest and up front, admitting your involvement and—and what you did can go a[ ]ways to showing your remorse and" "[s]ometimes that works in your favor. Sometimes it doesn't."

Starting with the first challenged statement, defendant characterizes it as "an implied promise of leniency." But we find this statement too vague, under the circumstances of this case, to evidence a promise of anything. At most, the officer simply informed defendant that full cooperation "c[ould] possibly" be beneficial in some unspecified way. But that is not enough to show improper coercion under case precedent. (See *People v. Carrington* (2009) 47 Cal.4th 145, 174 [finding no promise of leniency when "[t]he interviewing officers did not suggest they could influence the decisions of the district attorney, but simply informed defendant that full cooperation might be beneficial in an unspecified way"]; *People v. Falaniko* (2016) 1 Cal.App.5th 1234, 1251 [finding no promise of leniency in "officers' exhortations for honesty and cooperation" and "statement that the judge would consider appellant's cooperation"; "such 'brief and bland references . . . do not push this case over the forbidden line of promised threats or vowed leniency' "], disapproved on another ground in *People v. Canizales* (2019) 7 Cal.5th 591, 607, fn. 5.)

Turning to the second challenged statement, defendant contends this statement was "another implied promise of leniency." But this claim too falls short. As our Supreme Court has explained, " ' "[w]hen the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct," the subsequent statement will not be considered involuntarily made.' " (*Holloway, supra*, 33 Cal.4th at p. 115.) And that is all that occurred here. The officer

8

truthfully told defendant that "sometimes" it "works in your favor" to be "honest," "up front," and "admit[] . . . involvement"; "[s]ometimes it doesn't." (See Cal. Rules of Court, rule 4.423(b)(8) [for sentencing purposes, it is a factor in mitigation if "[t]he defendant voluntarily acknowledged wrongdoing before arrest or at an early stage of the criminal process"].)

We find nothing unduly coercive in this comment. Nor have other courts under similar circumstances. (See *Holloway, supra*, 33 Cal.4th at p. 117 [no improper coercion when an officer "urg[es] a suspect to tell the truth by factually outlining the benefits that may flow from confessing"]; see also *People v. Tully* (2012) 54 Cal.4th 952, 994 [no improper coercion when "defendant was told if his statement was truthful and he otherwise qualified, he and his family could be placed into a witness protection program if the district attorney approved"]; *People v. Carrington, supra*, 47 Cal.4th at p. 174 [no improper coercion when "officers did not suggest they could influence the decisions of the district attorney, but simply informed defendant that full cooperation might be beneficial in an unspecified way"]; *People v. Jones* (1998) 17 Cal.4th 279, 297, 298 [no improper coercion when detective offered to "intercede with the district attorney on defendant's behalf, telling the district attorney that defendant had been honest"; these offers "amounted to truthful implications that his cooperation might be useful in later plea bargain negotiations"]; *People v. Falaniko, supra*, 1 Cal.App.5th at pp. 1249, 1251 [no improper coercion when officer told defendant that " 'it's in your best interest to be cooperative' " and that the judge would take note of "you're being cooperative"].)

B.  *Section 1170*

Defendant next, in a supplemental brief, focuses on a recent amendment to section 1170. At the time of sentencing, and as relevant here, section 1170, subdivision (b) stated:  "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court." (Stats. 2020, ch. 29, § 14.) But subsequently, with Senate Bill

9

No. 567 (2020-2021 Reg. Sess., Senate Bill No. 567), the Legislature amended the statute to limit the sentencing discretion of trial courts. (Stats. 2021, ch. 731, § 1.3.) As amended, the statute generally requires a court to "order imposition of a sentence not to exceed the middle term," except in circumstances we will turn to in a moment. (§ 1170, subd. (b)(1).) Defendant contends he is entitled to the ameliorative benefit of this statute on remand. The Attorney General agrees. So do we.

New criminal laws generally operate only prospectively unless the enacting body "expressly" declares a contrary intent. (§ 3.) But not always. "[U]nder [*In re Estrada* (1965) 63 Cal.2d 740], ' "[A]n amendatory statute lessening punishment is presumed to apply in all cases not yet reduced to final judgment as of the amendatory statute's effective date" [citations], unless the enacting body "clearly signals its intent to make the amendment prospective, by the inclusion of either an express saving clause or its equivalent." ' " (*People v. Lara* (2019) 6 Cal.5th 1128, 1134; see also *People v. Nasalga* (1996) 12 Cal.4th 784, 789, fn. 5 ["a judgment is not final until the time for petitioning for a writ of certiorari in the United States Supreme Court has passed"].)

This presumption favors retroactive application of section 1170's new language in this case. The Legislature, as all parties agree, offered no indication that it intended its changes to section 1170 to apply prospectively only. Although for certain earlier amendments to section 1170, the Legislature specified that they should only apply "prospectively" (see § 1170, subd. (h)(7)-(8)), it included no similar language for its changes in Senate Bill No. 567. And these changes, as all parties further agree, potentially lessen punishment for defendants sentenced to the upper term on an offense. Although section 1170 once granted trial courts broad discretion to choose whether to impose the lower, middle, or upper term for an offense, it now, as mentioned, favors imposition of the lower or middle term. It generally requires a court to "order imposition of a sentence not to exceed the middle term" (§ 1170, subd. (b)(1)), and it allows a higher sentence "only when there are circumstances in aggravation of the crime that justify the

10

imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2); but see § 1170, subd. (b)(3) [allowing a court to "consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury"].)

For these reasons, like both the parties, we find section 1170's current statutory language applies retroactively in all non-final cases, including in this case. All published cases to consider this issue have found likewise. (See, e.g., *People v. Flores* (2022) 73 Cal.App.5th 1032, 1039 ["the amended version of section 1170, subdivision (b) that became effective on January 1, 2022, applies retroactively in this case as an ameliorative change in the law applicable to all nonfinal convictions on appeal"]; *People v. Flores* (2022) 75 Cal.App.5th 495, 500 (*Flores*) ["[t]hese amendments [to section 1170] apply retroactively to [defendant] because his conviction was not final when this legislation took effect"].)

We also, again like both the parties, find that remand for resentencing is appropriate in this case. But we do not do so simply because, as defendant and the Attorney General note, the trial court relied on facts that were not found true in the manner section 1170 now prescribes. That, to be sure, evidences the trial court's error; but error in itself is not ground for reversal. After all, for instance, if a trial court found true a single aggravating fact that it believed supported imposition of an upper term sentence, and if a jury necessarily would have found that same fact true had it considered

11

the matter, then a reviewing court would not remand for resentencing simply to address this plainly harmless error. (See *Flores, supra*, 75 Cal.App.5th at pp. 500-501.)[2]

We thus, before finding remand appropriate, must first subject the trial court's error to harmless error review. Reviewing courts subject most trial court errors to harmless error review, either under the standard described in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) or the standard described in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (*People v. Gonzalez* (2018) 5 Cal.5th 186, 195-196; but see *id.* at p. 196 [errors that are structural in nature are not subject to harmless error analysis].) The *Chapman* standard covers errors involving "violations of the federal Constitution" and "requires reversal unless the error is harmless 'beyond a reasonable doubt.' " (*Id.* at pp. 195-196.) The *Watson* standard, in turn, covers errors involving violations of state law and requires reversal if "it is ' "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' " (*Id.* at p. 195.) We find both these standards relevant in reviewing the trial court's error here.

First, we find *Chapman* applies. That is because the trial court's error violated defendant's right to trial by jury safeguarded by the Sixth and Fourteenth Amendments. The Supreme Court's decision in *Cunningham v. California* (2007) 549 U.S. 270 (*Cunningham*) demonstrates as much. The court there considered an earlier version of section 1170, which "provide[d] that 'the court shall order imposition of the middle term, unless there are circumstances in aggravation or mitigation of the crime,' " and added that " '[c]ircumstances in aggravation or mitigation' are to be determined by the court after consideration of several items." (*Cunningham, supra,* at p. 277.) The Supreme Court found this scheme violated the Sixth Amendment. Under the Sixth Amendment,

---

[2] In some sense, the trial court here committed no error; it simply applied existing law. But in another sense, from the perspective that section 1170's new language applies retroactively in this case, it did commit error.

the court explained, "any fact [other than a prior conviction] that exposes a defendant to a greater potential sentence must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely by a preponderance of the evidence." (*Id.* at p. 281.) But former section 1170, the court concluded, defied this rule. It allowed a trial court to impose an upper term sentence only if aggravating circumstances existed, but it then improperly assigned to the trial court, not the jury, the task of determining whether such circumstances existed. (*Cunningham, supra,* at pp. 288-289.) Finding this sentencing scheme inconsistent with the Sixth Amendment, the court explained that "the Federal Constitution's jury-trial guarantee proscribes a sentencing scheme that allows a judge to impose a sentence above the statutory maximum based on a fact, other than a prior conviction, not found by a jury or admitted by the defendant." (*Id.* at pp. 274-275.)

The current text of section 1170, of course, does not include this same defect. But when a trial court, inconsistent with the statute's current requirements, imposes an upper term sentence based on its own factfinding, the same constitutional issue arises. Under those types of facts, which are the facts of this case, the trial court has found a fact that exposes a defendant to a greater potential sentence. But again, a court cannot do so consistent with the Sixth Amendment's jury-trial guarantee. As the *Cunningham* court explained, "any fact [other than a prior conviction] that exposes a defendant to a greater potential sentence must be found by a jury, not a judge," under the Sixth Amendment. (*Cunningham, supra*, 549 U.S. at p. 281.) Under the facts of this case, then, the trial court's imposition of the upper term based on its own factfinding violated defendant's rights under the Sixth Amendment.

We thus must review the trial court's error under the standard described in *Chapman*.[3] And more particularly, we must apply this standard in the manner detailed in

---

[3] Although courts have often said "the denial of the defendant's right to a jury trial . . . involve[s] fundamental 'structural defects' in the judicial proceedings" ' " (*People v.*

13

*People v. Sandoval* (2007) 41 Cal.4th 825 (*Sandoval*). Our Supreme Court there, in the wake of *Cunningham*, considered the appropriate application of *Chapman* for "[t]he [unconstitutional] denial of the right to a jury trial on aggravating circumstances." (*Id.* at p. 838.) In laying out its reasoning, the court explained that " 'the constitutional requirement of a jury trial and proof beyond a reasonable doubt applies only to a fact that is "legally essential to the punishment." ' " (*Id.* at pp. 838-839.) And because, the court went on, all that was legally essential to authorize a trial court to impose an upper term sentence under former section 1170 was a single aggravating circumstance, a jury's finding a single aggravating circumstance to be true would be enough to satisfy the Sixth Amendment. (*Sandoval, supra,* at p. 839.) On this reasoning, the court concluded: "[I]f a reviewing court concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury, the Sixth Amendment error properly may be found harmless." (*Ibid.*) Considering the parallels between *Sandoval* and the case here, we must (and will shortly) apply this standard in evaluating whether the Sixth Amendment error here properly may be found harmless.

Second, apart from finding *Chapman* applies, we also find *Watson* applies in this case. It applies because even if we find the jury would have found true at least one of the aggravating circumstances that the trial court relied on, we still must grapple with the trial court's reliance on other aggravating circumstances inconsistent with the current requirements of section 1170. That is because, unlike for the Sixth Amendment error, it is not enough that we find the trial court *could* have imposed the upper term sentence (based on the conclusion that the jury would have found true at least one aggravating circumstance). Rather, to find harmless error for the state law error, we must find that the

---

*Sivongxxay* (2017) 3 Cal.5th 151, 179), and so is *per se* reversible, the Supreme Court has found that "[f]ailure to submit a sentencing factor to the jury . . . is not structural error" (*Washington v. Recuenco* (2006) 548 U.S. 212, 222).

14

trial *would* have imposed the upper term sentence even absent the error. In particular, we must consider whether it is reasonably probable that the trial court would have chosen a lesser sentence in the absence of the error. (See *People v. Price* (1991) 1 Cal.4th 324, 492 ["When a trial court has given both proper and improper reasons for a sentence choice, a reviewing court will set aside the sentence only if it is reasonably probable that the trial court would have chosen a lesser sentence had it known that some of its reasons were improper"].) Resolving this issue entails two layers of review. We must first, for each aggravating fact, consider whether it is reasonably probable that the jury would have found the fact not true. We must then, with the aggravating facts that survive this review, consider whether it is reasonably probable that the trial court would have chosen a lesser sentence had it considered only these aggravating facts.

In reaching this conclusion on the appropriate framework for harmless error review, we agree in part and disagree in part with *Flores, supra*, 75 Cal.App.5th 495, one of a few recent published decisions to consider this issue in the context of Senate Bill No. 567. Like *Flores*, we agree we must review the trial court's error under the standard generally described in *Chapman* and specifically applied in *Sandoval*. (*Flores, supra,* at p. 500.) But unlike *Flores*, we find this analysis insufficient in itself to justify affirmance. *Sandoval* considered a similar Sixth Amendment error that necessitated *Chapman* review. (*Sandoval, supra*, 41 Cal.4th at pp. 838-839.) That is why we agree it is relevant to our analysis. But *Sandoval* is different in that here, unlike in *Sandoval*, we also have state law error. And so we also have to consider whether this state law error, in addition to the Sixth Amendment error, was harmless. That requires us to apply *Watson*.[4]

---

[4] Of course, if a trial court's error cannot be deemed harmless under the *Chapman*/*Sandoval* standard, then a reviewing court need not proceed to the *Watson*

15

Our conclusion in this respect accords with the recent decision in *People v. Lopez* (2022) 78 Cal.App.5th 459 (*Lopez*), though our approach is somewhat different. The court there wrote: "The question of prejudice under retroactive application of the revised triad system involves a two-step process . . . . [T]he initial relevant question . . . is whether the reviewing court can conclude beyond reasonable doubt that a jury would have found true beyond a reasonable doubt *all* of the aggravating factors on which the trial court relied in exercising its discretion to select the upper term. If the answer to this question is 'yes,' then the defendant has not suffered prejudice from the court's reliance on factors not found true by a jury in selecting the upper term. However, if the answer to the question is 'no,' we then consider the second question, which is whether a reviewing court can be certain, to the degree required by [*Watson*], that the trial court would nevertheless have exercised its discretion to select the upper term if it had recognized that it could permissibly rely on only a single one of the aggravating factors, a few of the aggravating factors, or none of the aggravating factors, rather than all of the factors on which it previously relied. If the answer to both of these questions is 'no,' then it is clear that remand to the trial court for resentencing is necessary." (*Id.* at p. 467, fn. 11; see also *People v. Wandrey* (July 7, 2022) ___Cal.App.5th___ [2022 Cal. App. LEXIS 595], p. *28 [following *Lopez*].)

We agree in principle with these conclusions. But we find it helpful to frame the issue somewhat differently. Again, similar to *Lopez*, we also apply a two-step process when evaluating for prejudice in these circumstances, with the first step evaluating for *Chapman* error under *Sandoval*'s framework and the second step evaluating for *Watson* error. But unlike the *Lopez* court, we find a reviewing court must always evaluate for *Watson* error before concluding that the trial court's error was harmless. True enough, as

standard. And similarly, if the error cannot be found harmless under the *Watson* standard, a reviewing court need not proceed to the *Chapman*/*Sandoval* standard.

16

the *Lopez* court concluded, a defendant has not suffered prejudice if "a jury would have found true beyond a reasonable doubt *all* of the aggravating factors on which the trial court relied." (*Lopez, supra*, 78 Cal.App.5th at p. 467, fn. 11.) But that is because, in that case, it was not reasonably probable that the trial court would have chosen a lesser sentence had it fully complied with section 1170's requirements. In other words, there was no *Watson* error in those circumstances. All that said, our quibble with *Lopez* is a very minor one. Both our approach and the *Lopez* court's approach are the same in terms of outcomes.

Applying these principles in this case, we find that the denial of defendant's right to a jury trial on the aggravating circumstances was harmless in terms of the Sixth Amendment violation. But we cannot say the same for the state law violation. At sentencing, the trial court found two factors in mitigation: (1) defendant "admitted early" his participation in the crime, and (2) Scott "did not request to go the hospital at the time" of the attack. It also found eight factors in aggravation: (1) "[Scott] was particularly vulnerable . . . given his mental status," (2) the attack "was two against one" with the assailants coming from behind, (3) defendant used a weapon, a liquor bottle, to knock Scott down, (4) defendant "[]gratuitously kicked [Scott] in the head" when he was on the ground, (5) defendant "rifled through [Scott's] pockets" and "took his wallet" after knocking him to the ground, (6) defendant left Scott injured and alone in an alley, (7) defendant had at least one prior prison commitment, according to the probation report, and (8) at the time of the offense, defendant was on post-release community supervision for another crime.

As all parties acknowledge, the trial court found none of these aggravating facts consistent with the current text of section 1170. Defendant stipulated to none of these facts. Nor did a jury find any of these facts to be true beyond a reasonable doubt. And although a "court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior

17

convictions to a jury" (§ 1170, subd. (b)(3)), the court here relied on the probation report for its findings concerning defendant's criminal history, not any certified record of conviction.

Still, at least four of the trial court's listed factors in aggravation appear to be indisputable. Video evidence clearly shows the attack "was two against one" with defendant and his accomplice attacking Scott from behind. It shows defendant used a weapon, a glass bottle, to knock Scott down. It shows defendant "kicked [Scott] in the head" when Scott was on the ground with his hands around his head. And it shows defendant left Scott injured and alone in an alley. It also, as to another of the court's listed factors, shows defendant "rifled through [Scott's] pockets" after knocking Scott to the ground. But it does not, as the court further found, show that he "took [Scott's] wallet." Instead, at least according to defendant's testimony at trial, defendant's accomplice took Scott's wallet and defendant took Scott's knife and pipe.[5]

On this record, we find the Sixth Amendment error was plainly harmless. In particular, we find "beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury." (*Sandoval, supra*, 41 Cal.4th at p. 839.) But we cannot find the state law error harmless too. Although, as mentioned, we are satisfied that the jury would have found true at least four of the listed aggravating circumstances had it been asked to consider these matters, we are not convinced the trial court would have found these circumstances alone sufficient to

---

[5] Defendant offered a different narrative of the events that countered one of these findings. He claimed that he "stomp[ed] on [Scott's] head" because he believed Scott was reaching for a knife, which, if true, would undermine the trial court's finding that this act was done "[]gratuitously." But because, as the video evidence shows, both of Scott's hands were around his head when defendant "stomped" on him, we do not find it reasonably probable that any juror would have accepted defendant's version of these events.

warrant imposition of the upper term sentence. The trial court gave no particular weight to any of its listed aggravating circumstances. Nor did it indicate whether its decision to impose the upper term was (or was not) a close call. It simply laid out the various factors in aggravation and mitigation and then stated that, "for all those reasons, I give him the upper term [sentence]." Because, on this record, we cannot determine whether the trial court would have issued the same sentence had it been left with only these four aggravating circumstances, we must reverse. (See *People v. Avalos* (1984) 37 Cal.3d 216, 233 [reviewing court must "reverse where it cannot determine whether the improper factor was determinative for the sentencing court"].)[6]

---

[6] Under the *Flores* court's reasoning, we could also find the jury would have found two additional aggravating circumstances true: (1) Defendant had at least one prior prison commitment, and (2) at the time of the offense, he was on post-release community supervision for another crime. In our reading of *Flores* on this topic, the court effectively said this: When the trial court wrongly relies on a defendant's criminal history in a probation report to find aggravating circumstances, the reviewing court can find the error harmless because the prosecution, had it tried, easily could have produced the necessary materials to prove this criminal history. (*Flores, supra*, 75 Cal.App.5th at p. 501.) We decline to adopt this reasoning here, however. If the record is insufficient to support a trial court's findings about a defendant's criminal history, we will not presume the existence of extra-record materials, however likely they are to exist, to address this insufficiency.

### III. DISPOSITION

The conviction is affirmed and the sentence is vacated. The matter is remanded to the trial court for resentencing consistent with the recent amendment to section 1170. Following resentencing, the trial court must prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.

/S/

_____

RENNER, J.

We concur:

/S/

_____

HULL, Acting P. J.

/S/

_____

DUARTE, J.