Filed 12/21/23  P. v. Webb CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>DANNY WEBB, JR.,<br><br>　　　Defendant and Appellant. | A165262<br><br>(Alameda County<br>Super. Ct. No. 20-CR-007928) |

　　　Danny Webb, Jr., (appellant) appeals from his convictions, following a jury trial, for murder and related charges.  He argues the trial court erred in instructing the jury and in an evidentiary ruling involving lyrics found on appellant's cellphone.  We affirm.

## BACKGROUND

*The Oakland Shooting*

　　　On April 17, 2020, the victims, Justin Esco, Dontaye T., Deonte M., and Brandon L., drove from Bakersfield to Oakland, where Dontaye T. planned to buy marijuana.  Upon arriving in Oakland, the group parked at a 76 gas station located near 98th Avenue and Edes Avenue.  Dontaye T. learned that his marijuana contact was out of town and so he reached out to others,

1

including Demarya V., to arrange an alternative plan. Eventually, Demarya V. told Dontaye T. he had arranged a deal and led them several blocks away to a car wash located next to a Shell gas station at Golf Links Road and Mountain Boulevard.

Surveillance videos from the car wash and Shell station were played for the jury. Shortly before Demarya V. and the victims arrived, a black sedan parked across the street from the car wash and turned off its lights. A white truck and a silver car that had arrived with the black sedan were parked nearby but out of sight. Around 10:30 p.m., Demarya V. parked on the street in front of the car wash, leaving space in front of him. Esco, who was driving the victims' car, parked directly in front of Demarya V.

Shortly after they arrived, Demarya V. pulled his car alongside the victims' car and said through the open window, " 'The weed about to be here.' " The white truck pulled up directly behind Demarya V.'s car. As Demarya V. drove away, a man exited the truck's front passenger seat and opened fire on the victims' car. Another passenger started shooting from inside the white truck, and two people exited the black sedan parked across the street and also began shooting at the victims' car. Deonte M., seated behind the driver's seat of the victims' car, fired a gun over his shoulder through the back of the car.

Esco died from multiple gunshot wounds. Deonte M. was injured in the shooting. When the assailants stopped firing and the white truck and black sedan drove off, Deonte M., Brandon L., and Dontaye T. got out of their car and ran to the Shell station next door. Shortly after they reached the Shell station, shots were fired at them from a silver car driving by.

There was no evidence of appellant's blood, DNA, or fingerprints at either shooting scene.

*Appellant is Left at Kaiser Richmond Hospital*

At about 11:00 p.m. on April 17, 2020, a black sedan sped into the Kaiser Richmond parking lot. A man in his 20's got out, pulled appellant out of the car, and said he needed help. The man got back in the car and the black sedan drove off. Appellant had no identification or phone on him.

Surveillance video of the hospital parking lot and entrance was played for the jury. Shortly after the black sedan arrived, a white truck and a silver car also entered the hospital parking lot and waited near the black sedan. The black sedan then drove off, followed by the white truck and silver car.

Appellant had been shot in the chest and was unresponsive. He was hospitalized for over a week.

*Cellphone Evidence*

About five months before the shooting, appellant gave a phone number with a 707 area code as his personal number to a government agency. When appellant was arrested on May 28, 2020, he had the 707 cellphone and another phone on his person. The 707 cellphone had self-portraits of appellant and a photograph of appellant's debit card stored on it.

On the night of the shooting, at about 9:49 p.m., the 707 phone connected to a cell phone tower near the 76 gas station where the victims initially stopped. At about 10:35 p.m., the phone connected to a tower approximately three blocks from the car wash where the shooting occurred. Between 11:15 p.m. and 12:54 a.m., it connected to a tower near Kaiser Richmond.

Service for the 707 number was terminated on April 22, 2020, a few days after the shooting. On April 28, 11 days after the shooting, appellant informed a government agency that he had a new personal phone number.

3

*Additional Evidence*

Deonte M.'s sister had a child with appellant and Deonte M. testified he and appellant had a good relationship. Dontaye T. and Brandon L. testified they did not know appellant. Photographs of Esco's older brother and two other people known to associate with Esco were on the 707 phone associated with appellant. Appellant was living in Vallejo at the time of the shooting, and Esco, Deonte M., and Dontaye T. all had ties to Vallejo.

On the night of the shooting, Aaron C. was sleeping in his vehicle outside the Shell station when he was awakened by the gunfire. He looked past the Shell station and saw a person near the driver's side of a white pickup truck with tattoos on his hand firing a gun, then getting back into the truck. Aaron C. thought this man had been shot. When Aaron C. contacted the police after the shooting, he selected appellant's photograph as looking similar to the man he saw, but at trial he testified that the person in the photograph had a darker complexion than appellant.

Vandy Webb, appellant's wife, testified that in April 2020 they had been dating for years but were not yet married.[1] Around 11:00 p.m. on April 17, 2020, Vandy received a call from appellant and, based on that conversation, she immediately drove from her home in Sacramento to Kaiser Richmond. Phone records showed that at 11:34 p.m. (when appellant was being treated at the hospital and did not have his phone), the 707 cell number was used to make a call to Vandy lasting several minutes. Records also showed numerous text messages exchanged between the 707 phone and Vandy's phone on April 18. At trial, Vandy testified she did not remember who the call or texts were with or what the communications had been about.

---

[1] To avoid confusion, we will refer to Vandy Webb by her first name. No disrespect is intended.

*Verdict and Sentence*

The jury found appellant guilty of the first degree murder of Esco (Pen. Code,[2] § 187, subd. (a)); three counts of attempted murder of Deonte M., Dontaye T., and Brandon L., respectively (§§ 664, 187, subd. (a)); shooting at an occupied motor vehicle (§ 246); carrying a loaded firearm (§ 25850, subd. (a)); and possession of a firearm by a prohibited person (§ 29800, subd. (a)(1)).

As to the murder count, the jury found true allegations that appellant caused great bodily injury or death (§ 12022.7, subd. (a)), personally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)), and personally used a firearm (§ 12022.5 subd. (a)). As to the counts of attempted murder of Deonte M. and shooting at an occupied motor vehicle, the jury found true allegations that appellant personally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)), and personally used a firearm (§ 12022.5, subd. (a)).

As to the attempted murders of Dontaye T. and Brandon L., the jury found true that appellant personally used a firearm (§ 12022.5, subd. (a)), but found not true that appellant personally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)).

The trial court sentenced appellant to an aggregate term of 71 years to life in state prison.

## DISCUSSION

I. *Trial Court's Response to Jury Question*

Appellant argues the trial court's response to a jury question during deliberations was both an improper ex parte communication and

---

[2] All undesignated statutory references are to the Penal Code.

instructional error. We conclude the instruction was erroneous but find the error harmless.

A. *Additional Background*

During deliberations, the jury sent the following question: "Does aiding and abetting apply to the portion of 'count 1' stating: [¶] '. . . the defendant personally discharged a firearm and caused great bodily injury or death to Justin Isaiah Esco within the meaning of Penal Code [s]ection 12022.53(d).' "[3] The court responded, "Yes."

Defense counsel moved for a mistrial, arguing the response constituted an improper ex parte communication between the trial court and the jury because counsel did not have the opportunity to respond to the court's proposed response before it was submitted to the jury. Defense counsel further argued the response provided was erroneous.

The court stated counsel for both parties and the court had previously agreed that the court would notify counsel of any jury questions and, "if [counsel] wanted to respond in a timely fashion, the Court would consider that." After the court provided e-mail notification to counsel of the question at issue and "[h]eard no response for over 10 minutes," the court provided the

---

[3] The jury had been instructed on aiding and abetting pursuant to CALCRIM Nos. 400 and 401. We reject appellant's challenges to the aiding and abetting instructions in part II, *post*. The jury had also been instructed, as to section 12022.53, subdivision (d): "To prove that the defendant intentionally discharged a firearm, the People must prove that: [¶] 1. The defendant personally discharged a firearm during the commission or attempted commission of that crime; [¶] AND [¶] 2. The defendant intended to discharge the firearm. [¶] If the People have proved both 1 and 2, you must then decide whether the People also have proved that the defendant's act caused great bodily injury to or the death of a person who was not an accomplice to the crime." (See CALCRIM No. 3150.)

6

response to the jury.[4]  The court further found the instruction provided was correct, and denied the motion for mistrial.

      B.     *Instructional Error*

On appeal, appellant renews both challenges to the instruction.  We need not decide whether the response was an improper ex parte communication because we find the instruction provided was erroneous.

Section 12022.53, subdivision (d) (hereafter section 12022.53(d)) provides, in relevant part, "a person who, in the commission of [specified felonies, including murder], personally and intentionally discharges a firearm and proximately causes great bodily injury . . . or death, to a person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life."

Appellant argues there is no aiding and abetting liability for section 12022.53(d).  We agree.  As appellant notes, section 12022.53, subdivision (e)(1)(B) provides the enhancement applies to any "principal in the commission of an offense" if the person committed a felony for the benefit of or in association with a criminal street gang and "*[a]ny principal in the offense committed any act specified in subdivision (b), (c), or (d).*"  (Italics added.)  "Section 12022.53, subdivision (e)(1), expressly extends liability to aiders and abettors to crimes by a principal armed with a gun, for crimes committed in furtherance of the purposes of a criminal street gang."  (*People v. Garcia* (2002) 28 Cal.4th 1166, 1176.)  "In all other killings subject to section 12022.53, subdivision (d)—that is, killings not for the benefit of a criminal street gang—a principal, including an aider and abettor, *is only subject to the 25-year enhancement if he or she personally and intentionally*

---

[4] Defense counsel represented that she responded 11 minutes after receiving the court's e-mail.

*discharged a firearm causing death.*" (*People v. Hernandez* (2005) 134 Cal.App.4th 474, 480, italics added.)

The People concede that the enhancement "requires personal and intentional *discharge* of a firearm," but argue it "does not require that the shot discharged *strike* or kill the victim" because the enhancement only requires the defendant's firing proximately caused the injury or death. "Section 12022.53(d) requires that the defendant 'intentionally and *personally* discharged a firearm' . . . but only that he 'proximately caused' the great bodily injury or death." (*People v. Bland* (2002) 28 Cal.4th 313, 336.) As the People argue, courts have found proximate causation satisfied for purposes of section 12022.53(d) when a defendant was one among multiple shooters and the evidence does not reveal which shot caused the great bodily injury or death. For example, in *People v. Lopez* (2021) 73 Cal.App.5th 327, the Court of Appeal affirmed a section 12022.53(d) true finding where "[t]he evidence was sufficient to permit the jury to conclude that regardless of which defendant fired the shot that killed [the victim], [the defendant] personally and intentionally discharged a firearm, proximately causing [the victim's] death. The act that set in motion the chain of events resulting in [the victim's] death was the act, committed by both defendants, of firing a flurry of gunfire into the car in which [the victim] and [another person] were seated . . . ." (*Lopez* at p. 333; see also *Bland*, at pp. 337–338 ["[In a previous case,] two persons engaged in a gun battle, killing an innocent bystander. Who fired the fatal bullet, and thus who personally inflicted the harm, was unknown, but we held that the jury could find that *both* gunmen proximately caused the death. [Citation.] The same is true here [for purposes of § 12022.53(d) enhancement]. If defendant did not fire the bullets that hit the

8

victims, he did not *personally inflict*, but he may have *proximately caused*, the harm."].)

The People contend there is no reasonable possibility the jury understood the instruction to mean appellant need not have personally discharged a firearm. We disagree. The People point to the original instruction indicating such a requirement (see fn. 3, *ante*), but the jury's question included both elements of the enhancement—discharge of a firearm and causation—and the trial court's response indicated no distinction between the two elements. Because there is a reasonable possibility the jury construed the instruction to mean that, as long as the elements of aiding and abetting were met, they need not find appellant personally discharged a firearm, the trial court's instruction was erroneous.[5]

However, we agree with the People that the error was harmless beyond a reasonable doubt. The jury was instructed it could find the enhancement allegation true if appellant personally discharged a firearm (a valid theory), or if appellant aided and abetted another who personally discharged a firearm (an invalid theory). "Where a jury is instructed on alternate theories of liability, one legally valid and one legally invalid, a federal constitutional error has occurred" and reversal is required "unless we determine the error was harmless beyond a reasonable doubt." (*In re Lopez* (2023) 14 Cal.5th 562, 580.) "A reviewing court must determine whether any rational jury would have found the defendant guilty based on a valid theory if the jury had been properly instructed. 'The reviewing court examines what the jury necessarily did find and asks whether it would be impossible, on the

---

[5] We therefore need not decide whether, as the People apparently contend, aiding and abetting and proximate causation principles are effectively the same in this context.

9

evidence, for the jury to find *that* without *also* finding the missing fact as well.' [Citation.] In other words, if ' "[n]o reasonable jury that made all of these findings could have failed to find" ' the facts necessary to support a valid theory, the alternative-theory error was harmless." (*Id.* at pp. 584–585.)

Another verdict demonstrates the jury necessarily found appellant was one of the shooters: the jury found appellant guilty of possession of a firearm by a prohibited person.[6] First, there was no evidence that appellant possessed a firearm other than as one of the shooters. Second, the jury could not have convicted appellant of this count based on aiding and abetting principles because it was instructed that one of the elements was "The defendant had previously been prohibited" and that "The defendant and the People have stipulated, or agreed, that the defendant was previously prohibited." Because none of the other shooters were identified at trial, there was no evidence that any other shooter was a prohibited person, and therefore the jury could not have convicted appellant of aiding and abetting a prohibited person's possession of a firearm. Accordingly, because " ' "[n]o reasonable jury that made all of these findings could have failed to find" ' " appellant personally discharged a firearm, the instructional error was harmless.[7] (*In re Lopez, supra,* 14 Cal.5th at p. 585.)

---

[6] Appellant does not dispute that, if the jury found he was one of the shooters, his personal discharge of a firearm was a proximate cause of Esco's death.

[7] For the same reason, any error in the court's communication with the jury would also be harmless.

10

II.     *Aiding and Abetting Instructions*

Appellant argues the trial court erred in each of two aiding and abetting instructions. We reject the claims.

A.      *CALCRIM No. 400*

The trial court instructed the jury with CALCRIM No. 400 on general principles of aiding and abetting.[8] The instruction also included the following bracketed language that the CALCRIM No. 400 bench notes specify should be given when the prosecution is relying on the natural and probable consequences theory of aiding and abetting: "Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime." The court did not instruct the jury on the natural and probable consequences doctrine (see CALCRIM Nos. 402 & 403).

Appellant argues the inclusion of the bracketed language was prejudicial error as to the murder and attempted murder convictions because it allowed the jury to consider the natural and probable consequences theory.[9] We reject the claim. In *People v. Falaniko* (2016) 1 Cal.App.5th 1234, as here, the jury was instructed with the bracketed language but not otherwise instructed on natural and probable consequences. Because "[t]he prosecution

_____

[8] The jury was instructed: "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator."

[9] Appellant did not object to the instruction below, but the People concede the claim is not forfeited. (See *People v. Mil* (2012) 53 Cal.4th 400, 409 ["A trial court has a sua sponte duty to instruct the jury on . . . the elements of a charged offense"].)

here did not rely on the natural and probable consequences doctrine, nor was there any evidence in this case that the perpetrator committed another crime that was a natural and probable consequence of the intended offense," the Court of Appeal held "[t]he additional language thus amounted to ' "an 'abstract' instruction, i.e., 'one which is correct in law but irrelevant,' " ' " subject to state law prejudice analysis. (*Id.* at p. 1247.) The defendant failed to establish prejudice: "He neglects to specify any nontarget offense that the perpetrator actually committed for which appellant was found guilty as an aider and abettor. Nor does he identify any specific circumstances under which the jury might have convicted appellant for aiding and abetting 'other crimes that occurred during the commission of the first crime.' . . . [¶] None of [the defendant's] contentions persuades us that the error allowed the jury to convict appellant under the natural and probable consequences theory of aiding and abetting or any incorrect legal theory. We therefore conclude . . . that '[t]he instruction on the [natural-and-probable-consequence] rule must have been understood, and dismissed, by the jury as mere surplusage.' " (*Id.* at pp. 1247–1248, fn. omitted; see also *People v. Rivas* (2013) 214 Cal.App.4th 1410, 1433 [inclusion of bracketed language harmless where "the lack of prosecution argument on natural and probable consequences left meaningless the instructional language [the defendant] objects to"]; *People v. Estrada* (2022) 77 Cal.App.5th 941, 948 [affirming denial of resentencing relief where, "while here the inclusion of the bracketed language in CALCRIM No. 400 was erroneous, the error was harmless because . . . the prosecution never requested the instructions in CALCRIM Nos. 402 and 403, and the prosecution argued that [the defendant] intended to commit the charged offenses"].) The same analysis applies here.

12

Appellant argues these cases are distinguishable because here the prosecutor referenced the bracketed instruction in closing arguments. The reference, viewed in context, makes clear that the prosecutor was relying on a theory of *direct* aiding and abetting: "Under some circumstances, if the evidence established aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime. [¶] So even though you believe that [appellant] was in the black car and he gets shot, when the silver car takes that turn and the black car is gone, you're still responsible for what the people in the silver car did. That's how the law works because you're an aider and abettor. [¶] A perpetrator committed the crime, and these are the elements. *Defendant knew that the perpetrator intended to commit the crime. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator and his words or conduct did, in fact, aid and abet the perpetrator's commission of said crime.* They came there together. [¶] . . . [¶] You have to realize that this was a planned event. That they went to this area as a team to commit the same act. *They shared the same intent.* They set up together." (Italics added.)

Finally, as both the prosecutor and defense counsel argued, the clear plan of the perpetrators was to surround and fire directly into the victims' car. The prosecutor argued, "Whether [appellant] is the person who gets out of the vehicle, out of the black car, or he is the person in the white truck, he is still a perpetrator and an aider and abettor because this is a team gang. They are working as a team. They are all working together. They have an objective. Their objective is to kill. Their objective is to take these men's lives." Defense counsel similarly argued, "I'm not going to tell you that what happened to Mr. Esco was anything less than a first degree murder. That

13

was a vicious assassination. It was an ambush." In sum, as both sides argued, any person aiding and abetting this plan would know the shooters' intent was to kill those inside the victims' car.

Accordingly, the erroneous inclusion of the challenged language was harmless.

B. *CALCRIM No. 401*

The trial court further instructed the jury on aiding and abetting with CALCRIM No. 401.[10] Appellant requested the trial court include the following bracketed language in CALCRIM No. 401: "If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor." The trial court denied the request, finding no substantial evidence supported the instruction.

Appellant argues the trial court's refusal was erroneous. " 'A trial court must give a requested instruction only if it is supported by substantial

_____

[10] The jury was instructed: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone *aids* and *abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime. [¶] If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor."

14

evidence, that is, evidence sufficient to deserve jury consideration.' " (*People v. Leon* (2020) 8 Cal.5th 831, 848.) There is no evidence appellant was present at the scene of the shooting but *not* a part of the perpetrators' group and a participant in the carefully laid plan. As discussed above, as both parties agreed, the clear intent of the plan was to kill those inside the victims' car.

III. *Rap Lyrics*

Appellant raises multiple challenges relating to the trial court's in limine ruling that poetic writings found on appellant's cellphone would be admissible if appellant testified. The parties refer to these writings as rap lyrics; we will do so as well. We reject the challenges.

A. *Additional Background*

Before trial, the People filed an in limine motion seeking to admit rap lyrics found on the 707 cell phone written between April 28 and May 19, 2020. According to the People's motion, the lyrics included references to the murder of " 'June' " and apparent references to a revenge killing: " 'Lately I been in my feelings I just lost a brother. Had to take some [people] out before I lost another,' " and someone " 'killed June now he ain't here. Had to change the score board ima star player.' " The People represented that "June" was the nickname of a person who had been murdered in Vallejo on April 14, days before the shooting, and that Esco was suspected to be involved in this murder. The People further represented that appellant and June were from the same part of Vallejo and a shirt memorializing June was found at the home appellant and Vandy shared.

Appellant opposed the motion, arguing the lyrics were more prejudicial than probative. At argument on the motion, appellant's counsel also argued that referring to the lyrics as rap lyrics was "indicative of the racial bias,

15

frankly, that exists when we're talking about rap lyrics and young black men . . . from places like Vallejo or from places like Oakland."

The court reasoned that, although the lyrics were on a phone in appellant's possession at the time of his arrest, "how do I get to that he actually physically wrote the writing?  He may have that phone but somebody else may have used that phone."  Accordingly, the court precluded the People from using the lyrics in their case-in-chief, but ruled the People could use them on cross-examination if appellant testified.  Appellant did not testify at trial.

B.  *Evidence Code Section 352*

Appellant first argues the trial court abused its discretion because the rap lyrics were more prejudicial than probative under Evidence Code section 352.

" 'It is well established that the denial of a motion to exclude impeachment evidence is not reviewable on appeal if the defendant subsequently declines to testify.' " (*People v. Duong* (2020) 10 Cal.5th 36, 56–57.)  "[T]he rationale for the rule [is] as follows.  First, ' "[a] reviewing court is handicapped in any effort to rule on subtle evidentiary questions outside a factual context."  [Citation.] . . . "To perform this balancing [of weighing the probative value of the conviction against its prejudicial effect], *the court must know the precise nature of the defendant's testimony*, which is unknowable when, as here, the defendant does not testify." ' [Citation.]  Second, any harm from the trial court's ruling is ' "wholly speculative" ' since the trial court may change its ruling as the evidence is adduced and the prosecutor may decide not to use the prior conviction to impeach.  [Citation.]  Third, 'an appellate court cannot review that balancing process unless the record discloses "*the*

16

*precise nature of the defendant's testimony.*' " (*People v. Sanghera* (2016) 6 Cal.App.5th 365, 372, italics added by *Sanghera* (*Sanghera*).)

Appellant argues this rule does not apply here because the evidence takes the form of rap lyrics. Appellant fails to explain why the nature of the impeachment evidence renders the rationale for the rule inapplicable.[11] Even assuming, as appellant argues, the second rationale does not apply because the trial court would not have changed its ruling and the prosecutor would not have decided not to use the evidence, the rationales regarding the inability to conduct the balancing analysis squarely apply. Appellant's reliance on *People v. Brown* (1996) 42 Cal.App.4th 461 is unavailing. In *Brown*, the defendant challenged the impeachment evidence as obtained in violation of his constitutional right to counsel. (*Id.* at p. 468.) After considering the rationale discussed above, the Court of Appeal concluded "that when the defendant raises a pure issue of law concerning a fundamental constitutional right, the defendant need not testify to preserve error in the trial court's rulings on impeaching evidence." (*Id.* at p. 471.) This is not the case here, where the issue requires balancing the probative value against the prejudicial effect. Accordingly, appellant's Evidence Code section 352 challenge is procedurally barred.[12]

---

[11] To the extent appellant argues the California Racial Justice Act of 2020 (§ 745) (Racial Justice Act) establishes that the use of rap lyrics is per se prejudicial and thus a balancing test need not be performed, we reject the claim (see part III.D, *post*).

[12] For the same reasons, appellant's contention that the trial court's ruling impermissibly burdened his constitutional right to testify is barred. (*Sanghera, supra,* 6 Cal.App.5th at pp. 375–376 ["the procedural bar in those cases applies, notwithstanding defendant's attempt to elevate a state law evidentiary ruling to one implicating his constitutional right to testify or present a defense"].)

C.  *Evidence Code Section 352.2*

Appellant also challenges the trial court's ruling under newly enacted Evidence Code section 352.2, which provides:  "In any criminal proceeding where a party seeks to admit as evidence a form of creative expression, the court, while balancing the probative value of that evidence against the substantial danger of undue prejudice under Section 352, shall consider, in addition to the factors listed in Section 352, that: (1) the probative value of such expression for its literal truth or as a truthful narrative is minimal unless that expression is created near in time to the charged crime or crimes, bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available; and (2) undue prejudice includes, but is not limited to, the possibility that the trier of fact will, in violation of Section 1101, treat the expression as evidence of the defendant's propensity for violence or general criminal disposition as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings."  (*Ibid.*, § 352.2, subd. (a).)  Evidence Code section 352.2 was effective January 1, 2023, after appellant's trial.  We need not decide whether, as the parties dispute, the statute applies retroactively to cases that are not yet final, because we reject the claim in any event.

This is not a case where the rap lyrics plainly should have been excluded under Evidence Code section 352.2.  (Cf. *People v. Venable* (2023) 88 Cal.App.5th 445, 455 ["There's no question the trial judge's admission of the rap evidence in this case did not comply with the new requirements for admission of creative expression."], review granted May 17, 2023, S279081; see also *People v. Coneal* (2019) 41 Cal.App.5th 951, 969 ["We do not mean to suggest that lyrics are never probative of their literal truth.  For example, where lyrics are written within a reasonable period of time before or after the

charged crime and bear a sufficient level of similarity to the charged crime, their probative value as a statement of fact is increased."].) Significantly, they were written within weeks of the shooting, and therefore were "created near in time to the charged crime" (Evid. Code, § 352.2), rendering the possible probative value more than minimal. Because consideration under Evidence Code section 352.2 would therefore still require a balancing of the probative value with the potential for prejudice, review of the denial of the motion to exclude impeachment evidence is precluded here too because appellant did not testify.

D.    *Racial Justice Act*

Appellant challenges the trial court's ruling under the Racial Justice Act (§ 745). The parties dispute whether appellant raised the challenge below and whether a Racial Justice Act challenge can be raised on direct appeal in the first instance. We need not decide these issues because, assuming the challenge is cognizable on appeal, we reject it on the merits.[13]

Section 745 prohibits criminal convictions obtained "on the basis of race, ethnicity, or national origin." (§ 745, subd. (a).) A violation is established if it is shown, by a preponderance of the evidence, that: "During the defendant's trial, in court and during the proceedings, the judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror, used racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful. This paragraph does not apply if the

---

[13] In a separate petition for writ of habeas corpus, case No. A168196, appellant raises claims relating to the Racial Justice Act. We have denied that petition by separate order filed this date.

19

person speaking is relating language used by another that is relevant to the case or if the person speaking is giving a racially neutral and unbiased physical description of the suspect." (§ 745, subd. (a)(2).) We assume without deciding that we can consider appellant's Racial Justice Act claim even though appellant did not testify.

Appellant argues that "the admission of rap lyrics would, more likely than not, trigger the jury's implicit racial bias against African American men in violation of § 745(a)(2)" and that "Any inculpatory value in the use of the rap lyrics was necessarily based on racial stereotypes and inaccurate literal interpretation." In effect, appellant argues that *any* time rap lyrics are introduced against a criminal defendant, the evidence will cause the jury to be implicitly biased and therefore "exhibit[] bias or animus towards the defendant because of the defendant's race." To accept this argument would be to find that the prosecution's use of a defendant's rap lyrics is *always* a violation of the Racial Justice Act.

We see no basis to conclude that the Legislature intended such a result. To the contrary, after enacting the Racial Justice Act, the Legislature enacted Evidence Code section 352.2, discussed above. In so enacting, the Legislature expressly provided: "It is the intent of this Legislature to provide a framework by which courts can ensure that the use of an accused person's creative expression will not be used to introduce stereotypes or activate bias against the defendant, nor as character or propensity evidence; and to recognize that the use of rap lyrics and other creative expression as circumstantial evidence of motive or intent is not a sufficient justification to overcome substantial evidence that the introduction of rap lyrics creates a substantial risk of unfair prejudice." (Stats. 2022, ch. 973, § 1(b).) This statement, and Evidence Code section 352.2 itself, make clear that the

Legislature contemplated rap lyrics *could* be admitted in evidence in certain narrowly defined circumstances. We therefore decline to construe the Racial Justice Act such that the use of rap lyrics is always a violation. Appellant has failed to establish a violation of the Racial Justice Act.[14]

## DISPOSITION

The judgment is affirmed.

---

[14] Appellant argues he was cumulatively prejudiced by trial errors. We have found all errors or assumed errors harmless. Considered together, the errors and assumed errors are still harmless. (See *People v. Cain* (1995) 10 Cal.4th 1, 82 ["Defendant was entitled to a fair trial, not a perfect one."].)

SIMONS, ACTING P. J.

WE CONCUR:

BURNS, J.

CHOU, J.

A165262
*People v. Webb*