Filed 1/14/26  P. v. Justice CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br>DAVID MARTIN JUSTICE,<br><br>        Defendant and Appellant. | A169403<br><br>(Contra Costa County<br>Super. Ct. No. 05002017093) |

A jury convicted defendant David Martin Justice of several counts of forcible rape and lewd acts against his stepdaughter, Jane Doe, and the trial court sentenced him to 44 years in prison.  On appeal, Justice claims the court erred by (1) admitting evidence of uncharged sexual conduct between him and Doe that occurred in China; (2) modifying CALCRIM No. 1000, the form instruction on forcible rape, to further define duress; (3) giving both CALCRIM Nos. 3500 and 3501, which are alternative unanimity instructions; and (4) for the counts of lewd acts, instructing on a date range that included one day during which Doe was older than the statutorily required age.  He also contends these errors were cumulatively prejudicial.  We reject all these claims, order certain errors in the abstract of judgment corrected, and affirm.

# I.
## FACTUAL AND PROCEDURAL BACKGROUND

### A.    *Background and the Uncharged Conduct in China*

Doe was born on August 28, 2000, in Shanghai, China.  For most of her childhood, she lived with her mother, grandmother, and younger brother.  She had little contact with her father, who was divorced from her mother.

The prosecution's case rested primarily on the testimony of Doe, who was 22 years old at the time of trial.  Doe met Justice when she was around 12 years old and he began tutoring her brother in English.  A few months later, Doe's mother started dating Justice, and some months after that he moved in with the family.  Doe testified that she "looked up to [Justice] and respected him," and he "became [her] dad" because she "never really had a father figure."

About a year after Justice moved in, when Doe was 13, he started to "put [her] to bed every night, massage [her] back, as well as [her] butt."  She testified that he "eased into it," escalating from "backrubs" to "inserting his fingers" in her "vaginal area."  He also began having her "perform oral intercourse on him."  This activity "became [her and Justice's] daily routine. [They] would pretend like nothing ha[d] happened, and it would repeat every night."

Soon afterward, Justice began "[i]nserting his penis in [Doe's] vaginal area."  According to Doe, Justice had sexual intercourse with her over 10 times while the family lived in Shanghai.  Doe testified that the first time this happened, she went into Justice and her mother's bedroom to find her mother, who was in the bathroom.  Justice "pulled [Doe] [in]to bed," "turned [her] body onto the side," and quickly had intercourse with her.

Doe testified that Justice never sought her consent and did not talk to her about what he was doing to her. The sexual acts became "a routine," and she "just knew that is what [she] had to do" at bedtime and any other time the two were alone. She stated, "I looked up to him. I did what I was told. I was extremely confused and did not know what was going on. But I kept doing it because he was my father figure." If Doe failed to obey Justice, "there would be fights in the family due to his attitude and mood." She did not report the abuse or resist it because she "was scared that it was [her] fault" and "felt like it was [her] responsibility to maintain this happy family."

B.      *The Charged Conduct in California*

In April 2015, when Doe was 14, her family and Justice moved from China to Justice's mother's house in Orinda. At some point that year, Justice and Doe's mother married.

In Orinda, Justice continued to put Doe to bed, and he would "grab" her both over and under her clothes on her breasts, buttocks, and vaginal area. Some nights, he had sexual intercourse or oral sex with her. Justice also molested Doe at different times of the day when they were alone. She estimated that Justice had sexual contact with her "[a]t least twice a week" during this period.

Doe testified that she "would do whatever [Justice] wanted [her] to do," and "the only thing [she] cared about was having [her] family together." Doe "still loved him like he was [her] dad" and "had tremendous respect for him." Justice "would always say that no one loved [her] more" than he did and that he was her best friend. Doe testified that Justice "restricted a lot of [her] activities outside of the house" and did not allow her to socialize or have friends, so most of her time was spent with him and her family.

3

Several months after moving to Orinda, when Doe was 15, Justice and Doe's family moved to their own house in Walnut Creek. Doe testified that Justice's sexual contact with her became more frequent. The acts also became "a lot more aggressive" as she got older. As an example, she described an incident when Justice "bent [her] over the kitchen counter and thrust[] his penis in [her] so hard" that it bruised her chest. Doe estimated that the sexual contact occurred "[a]t least three times a week" during this time and more frequently when her mother was out of town.

Justice also became more controlling of Doe. When she "didn't do what he wanted," he "would spit mouthwash on [her] face and burn [her] eyes." Sometimes, he took out his anger on Doe's brother and mother. Justice monitored Doe's cell phone, and he got angry if she wished to go out with her friends or "ever wanted to leave his sight." Doe "knew that there was no way for [her] to fight back," so she "continued [the sexual] acts" with Justice to avoid angering him. She was "pretty much brainwashed," as she thought he was not doing anything wrong and she was to blame.

A couple years later, Doe began college nearby, and she moved into the dorms. Justice insisted that she keep in close contact with him through phone calls and text messages. She testified that "he was checking on [her] almost every hour," and he would get upset if she did not respond quickly. For example, he "force[d]" her to text him "happy birthday" at 6:13 a.m. or p.m. every day, since his birthday was June 13. If she did not do so, he accused her of not loving him or cheating on him.

Justice also required Doe to see him frequently, either at campus or at home in Walnut Creek. They continued to have sexual intercourse at least once a week, and she gave him "whatever [else] he needed" in terms of "verbal reassurance" so that she could "make sure that he was treating [her]

4

mom okay, making sure that they [were] all safe." Doe testified that she decided to go to college close to home in the first place so that she could "make sure that [Justice] didn't go psycho on [her] brother and [her] mom."

In her second year of college, Doe and Justice did not have sex as often. At the beginning of 2020, Doe returned from a two-week trip to Shanghai. Justice "was very upset" because they had not had intercourse for a while and he saw text messages on her phone between her and another man. Justice locked Doe in the garage of the Walnut Creek house with him. She testified that he was literally "foaming" at the mouth and spitting on her, and she was "very scared." Nothing that she said "was soothing his emotions[,] . . . [s]o just like routine, [she] went on [her] knees and performed oral copulation on him so that he could shut up."

Meanwhile, Doe's mother and brother arrived and realized that the garage door was locked. They were able to get inside, at which point Doe "broke down in tears and told them the truth." Justice "ran away" and did not return to the house. A couple days later, Doe reported the sexual abuse to the Walnut Creek police.

Subsequently, police officers investigating Doe's report observed Justice's car leaving his mother's home in Orinda. The officers attempted to pull over the car, but Justice accelerated and drove away from them. They followed Justice back to his mother's house, where they located him in the backyard. He was holding a shotgun and "saying . . . he wasn't going to jail [and] . . . was going to kill himself." After around an hour of "back and forth" during which the officers encouraged Justice to put down the gun, he surrendered. An officer who was present testified that at one point during the interaction, Justice said, "Yes, I did it once she was 13. There, I said it. I'm guilty."

C.       *Procedural History*

Justice was charged with 12 felony counts:  four counts of forcible rape of a child 14 years old or older, two counts of forcible rape, and six counts of lewd acts on a 14- or 15-year-old child.  As aggravating circumstances for each count, it was alleged that the victim was particularly vulnerable and the defendant took advantage of a position of trust or confidence.[1]

The jury convicted Justice of all the charges, and the trial court found the aggravating circumstances true.  The court then sentenced Justice to a total term of 44 years in prison, composed of four consecutive terms of 11 years—the aggravated term—for each count of forcible rape against a child 14 or younger; two concurrent terms of 8 years—the aggravated term—for the other counts of forcible rape; a concurrent term of 3 years—the aggravated term—for one count of lewd acts; and five concurrent terms of 2 years—the midterm—for the remaining counts of lewd acts.[2]

---

[1] The charges were brought under Penal Code sections 261, subdivision (a)(2) (all forcible rape counts), and 288, subdivision (c)(1) (lewd acts).  The aggravating circumstances were alleged under California Rules of Court, rule 4.421(a)(3) and (11) respectively.  The prosecution later elected not to proceed on a third alleged aggravating circumstance.  All further statutory references are to the Penal Code unless otherwise noted.

[2] The abstract of judgment inaccurately reflects that the two convictions for forcible rape when Doe was not a minor, counts five and six, were for "[r]ape by force upon child."  In addition, the abstract does not specify the year that each count of forcible rape was committed but instead gives the length of the term imposed, i.e., "11" or "8."  The trial court shall amend the abstract to correct these errors.

6

A.      *The Trial Court Did Not Err in Admitting Evidence of Uncharged Sexual Offenses that Happened in China.*

Justice claims the trial court should have excluded evidence of the uncharged sexual conduct between him and Doe that occurred in China (China-based conduct) under Evidence Code section 352.  Alternatively, he argues the court should have permitted him to introduce evidence of the lower age of consent in China and the traditional Chinese way of calculating age.  We are not persuaded on either count.

1.      Additional facts

Justice moved in limine to exclude the China-based conduct, including because it was "not criminal under California law" and unduly prejudicial under Evidence Code section 352.  The prosecution responded that the conduct was admissible under Evidence Code section 1108 because it qualified as prior sexual offenses.  The prosecution argued that "Doe [could not] possibly testify about the sexual abuse that occurred in the U.S. without also talking about the abuse in China," which was "essential" to the theory that Doe participated in the charged acts under duress.

The trial court ruled that the evidence was admissible under Evidence Code section 1108.  In doing so, it stated that even if certain conduct was "legal in a different jurisdiction," the conduct was still admissible under section 1108 if it would constitute a sexual offense under California law.  The court did, however, limit the evidence to that establishing the China-related facts the prosecution identified in its trial brief—namely that Justice "began to grope" Doe when she was 13; "escalated" to "fondling [her] vagina under her clothing"; and ultimately had sexual intercourse with her several times in

7

China, all of which Doe believed was his "attempting to 'teach and coach' her."

Although the trial court did not mention Evidence Code section 352 in ruling, it later agreed with Justice's trial counsel that it addressed that statute by limiting the scope of the China-based conduct to that discussed in the People's trial brief. The court also reaffirmed that Evidence Code section 1108 permits evidence of conduct that would violate California law even if it was not a crime in a different jurisdiction. The court ultimately instructed the jury under CALCRIM No. 1191A that it could consider evidence that Justice committed the uncharged offenses of forcible rape of a child under 14 and lewd acts against a child under 14 only for the purpose of determining that he "was disposed or inclined to commit sexual offenses" and in turn "was likely to commit and did commit" the charged offenses.

      2.     Discussion

Where a defendant is charged with a sexual offense, Evidence Code section 1108 permits the admission of "evidence of the defendant's commission of another sexual offense or offenses" to prove the defendant's propensity to commit the charged offense. (Evid. Code, § 1108, subd. (a); see *id.*, § 1101, subd. (a).) "Sexual offense" is defined as "a crime under the law of a state or of the United States that involved" enumerated types of conduct, including nonconsensual contact involving the defendant's or victim's genitals. (*Id.*, § 1108, subd. (d)(1).)

Even if otherwise admissible under Evidence Code section 1108, evidence of uncharged sexual offenses may nonetheless be excluded under Evidence Code section 352. (Evid. Code, § 1108, subd. (a).) Evidence Code section 352 permits a court to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will

8

(a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*Id.*, § 352.) We review the trial court's evidentiary rulings, including those under Evidence Code sections 1108 and 352, for an abuse of discretion. (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 824.)

Justice first argues that the China-based conduct was inadmissible under Evidence Code section 352 because it was "unnecessary, as [Doe's] testimony as to what happened in the United States was sufficient to argue that [he] had committed numerous sexual assaults," and "highly prejudicial" because Doe was only 13 when the conduct occurred. Justice makes this argument in a single paragraph without citing any authorities or discussing the basis of the trial court's ruling, meaning he necessarily fails to demonstrate an abuse of discretion.

In any case, we conclude the China-based conduct was probative of whether Justice committed the charged crimes and the circumstances under which he did so, including Doe's mind state based on her history of being sexually abused. We also disagree that this evidence was *unduly* prejudicial to Justice based solely on the fact that Doe was a year or two younger than she was during the earliest charged conduct. " ' " ' "The prejudice that [Evidence Code] section 352 ' "is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." [Citations.] "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors." ' " ' " ' " (*People v. Daveggio and Michaud, supra,* 4 Cal.5th at p. 824.) The court did not abuse its discretion under Evidence Code section 352 by admitting the China-based conduct.

9

Justice also argues that even if the China-based conduct was admissible, the trial court "[s]hould have allowed testimony regarding the age of consent in China and the two different systems for counting age in China" to decrease the challenged evidence's prejudicial effect. (Some capitalization omitted.) Citing to evidence that is not in the record, he claims that (1) "the age of consent in China is 14" and (2) "[u]nder the traditional age system[,] . . . a person is counted as one year old on the date of their birth and becomes one year older on the day of the Chinese New Year." He argues he could have used such evidence to demonstrate "a good faith belief that . . . Doe was over the age of consent in China when sexual activity started."

We agree with the Attorney General that Justice forfeited this argument by not seeking to introduce any evidence about Chinese law and practices. And even if the argument was not forfeited, it lacks merit. The China-based conduct that Doe described constituted a "sexual offense" under Evidence Code section 1108, which includes *any* nonconsensual genital contact (Evid. Code, § 1108, subd. (d)(1)(C)–(D)), regardless of her age when it happened. Thus, evidence of the age of consent or the calculation of age in China was unnecessary to prove Justice committed an uncharged sexual crime, and the trial court could have properly declined to admit such evidence had Justice proffered it. In short, no error appears in the court's admission of the China-based conduct.

B.     *The Pinpoint Instruction on Duress Was Proper.*

Justice claims the trial court erred by modifying CALCRIM No. 1000 in a way that suggested "a victim's subjective belief of a threat is sufficient to establish duress, even if there is no actual or implied threat." We conclude there was no error.

10

### 1. Additional facts

As to the six counts of forcible rape, the People requested the following pinpoint instruction on duress, which is a direct quote from *People v. Cochran* (2002) 103 Cal.App.4th 8 (*Cochran*): "The very nature of duress is psychological coercion. A threat to a child of adverse consequences, such as suggesting the child will be breaking up the family or marriage if she reports or fails to acquiesce in the molestation, may constitute a threat of retribution and may be sufficient to establish duress." Justice, on the other hand, requested the following pinpoint instruction to convey that "hardship is not duress": "Neither of the charged crimes can be accomplished by a direct or implied threat of imposing hardship. Hardship is something that causes deprivation or suffering by causing difficult or unpleasant conditions of life. An example would be economic hardship." (Some capitalization and boldface omitted.)

The trial court ruled that it would give the People's proposed instruction, which it found correctly stated the law, but not "any additional instructions" involving the meaning of "threats." Ultimately, the court instructed the jury under two versions of CALCRIM No. 1000, which were worded similarly except to indicate that four of the counts occurred when Doe was a "minor" and the other two counts occurred when she was a "woman." Both versions included the People's pinpoint instruction on duress.

After the verdict, Justice moved for a new trial on several bases, including that the pinpoint instruction on duress was incorrect. Specifically, he argued that "Doe's personal fear of the family breaking up," a consequence with which he never threated her, did not constitute duress. In denying the motion for a new trial, the trial court declined to reconsider its decision to give the challenged instruction.

11

2. Discussion

Under section 261, subdivision (a)(2), the statute under which Justice was convicted of forcible rape, an act of sexual intercourse constitutes rape "[i]f it is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person of another." The statute defines "duress" as "a direct or implied threat of force, violence, danger, or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which otherwise would not have been performed, or acquiesce in an act to which one otherwise would not have submitted. The total circumstances, including the age of the victim, and the victim's relationship to the defendant, are factors to consider in appraising the existence of duress." (§ 261, subd. (b)(1).)

We review claims of instructional error de novo. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) In determining whether an instruction was incorrect or ambiguous, " 'we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled.' " (*People v. Tran* (2022) 13 Cal.5th 1169, 1199.)

In *Cochran*, the Fourth District Court of Appeal explained that "[t]he fact that the victim testifies the defendant did not use force or threats does not require a finding of no duress; the victim's testimony must be considered in light of her age and her relationship to the defendant."[3] (*Cochran, supra,*

---

[3] *Cochran* addressed whether there was substantial evidence to support the defendant's convictions of (1) aggravated sexual assault on a child under age 14 under section 269, subdivisions (a)(3) and (4); and (2) forcible lewd acts on a child under age 14 under section 288, subdivision (b)(1). (*Cochran, supra,* 103 Cal.App.4th at p. 13.) Justice does not suggest that the meaning of "duress" is different under section 288 than it is under section 261, and we will assume for purposes of our discussion that decisions addressing "duress"

12

103 Cal.App.4th at p. 14, disapproved on another ground by *People v. Soto* (2011) 51 Cal.4th 229, 248 & fn. 12 (*Soto*).) *Cochran* stated the principles the instruction at issue here quoted—that "[t]he very nature of duress is psychological coercion" and "[a] threat to a child of adverse consequences" to the family structure could "constitute a threat of retribution . . . sufficient to establish duress"—when retreating from "overly broad" language in an earlier Fourth District opinion, *People v. Hecker* (1990) 219 Cal.App.3d 1238. (*Cochran*, at pp. 14–15.) *Hecker* had said that " ' "[p]sychological coercion" without more does not establish duress,' " and it held that "the victim's testimony that the defendant urged her not to report the molestations because it would ruin his marriage and naval career" was insufficient because it " 'establishe[d] merely the threat of hardship directed at "later disclosure of the sex acts and not [the failure to perform] the sex acts themselves." ' " (*Cochran*, at p. 14, quoting *Hecker*, at pp. 1250–1251 & fn. 7.) Distinguishing *Hecker*, *Cochran* held that there was substantial evidence of duress even though the defendant, the father of the nine-year-old victim, "told her not to tell anybody because he would get into trouble and would go to jail" but did not directly threaten her. (*Cochran*, at pp. 12, 15–16.)

Justice recognizes that the challenged instruction is "a direct quote" from *Cochran* and does not argue that it incorrectly states the law. Instead, he argues that "[t]he phrase 'a threat to a child of adverse consequences' is vague," because "[i]t could either mean a direct or implied threat made to a child or something that the child subjectively determines to be a threat." Relying on *Soto*, he argues that the instruction is incorrect if interpreted in the latter sense, since duress is defined objectively.

under section 288 apply here. (See *People v. Townes* (2025) 108 Cal.App.5th 603, 612, fn. 3.)

13

In *Soto*, the Supreme Court held that consent is not a defense to forcible lewd acts. (*Soto, supra,* 51 Cal.4th at p. 233.) Previous decisions had reasoned otherwise on the basis that "consent is logically inconsistent with the perpetrator's use of force or duress." (*Ibid.*) But *Soto* explained that "the legal definition of duress is objective in nature and not dependent on the response exhibited by a particular victim. . . . Because duress is measured by a purely objective standard, a jury could find that [a] defendant used threats or intimidation to commit a lewd act without resolving how the victim subjectively perceived or responded to this behavior." (*Id.* at p. 246.)

Although we agree with Justice that duress is measured objectively (§ 261, subd. (b)(1); *Soto, supra,* 51 Cal.4th at p. 233), there is no reasonable likelihood that any juror applied the pinpoint instruction in a legally impermissible manner. Initially, we note that the specific phrase he challenges—"a threat to a *child* of adverse consequences"— was not even applicable to the two counts of forcible rape that occurred when Doe was a "woman." (Italics added.) More importantly, both versions of CALCRIM No. 1000 given defined duress as "*a direct or implied threat* of force, violence, danger, or retribution that would cause *a reasonable person* to do or submit to something that she would not do or submit to otherwise." (Italics added.) Thus, even assuming the challenged phrase allowed the jury to find duress based on "something that [Doe] subjectively determine[d] to be a threat," the instructions as a whole made clear that threat also had to be a "direct or implied" one that "a reasonable person" would perceive as such.

Justice does not explain why there is a reasonable likelihood of juror confusion despite the balance of CALCRIM No. 1000. Instead, he focuses on the lack of evidence that he made any "actual or implied threat." We do not see how the state of the evidence on this point affects whether the pinpoint

14

instruction was proper. " 'Giving an instruction that is correct as to the law but irrelevant or inapplicable is error,' " but " 'generally " 'only a technical error which does not constitute ground for reversal.' " ' " (*People v. Falaniko* (2016) 1 Cal.App.5th 1234, 1247.) In any event, there was significant evidence that Doe was psychologically coerced into having sexual intercourse with Justice, who became physically and verbally abusive if she did not comply with his demands. He fails to show that the trial court erred by giving the challenged instruction.

C.     *The Challenge to the Unanimity Instructions Lacks Merit.*

Justice next claims that the trial court erred by giving two jury instructions on unanimity, CALCRIM Nos. 3500 and 3501, because they are "[m]utually [e]xclusive." We are not persuaded.

1.     Additional facts

Before trial, Justice moved to "requir[e] the prosecution to select the particular theory it intend[ed] to assert in proving [each] count alleged." The prosecution responded that since the sexual abuse happened frequently over several years, it "would be nearly impossible" to identify and elect a particular act for each charge. Relying on *People v. Jones* (1990) 51 Cal.3d 294, 316, the prosecution argued that it need only present evidence of "the type of conduct, the frequency of the conduct, [and] the general time period in which the acts occurred." The prosecution also requested both CALCRIM Nos. 3500 and 3501 on unanimity.

At the hearing on the motions in limine, the trial court stated this case involved "just generic charging" and it intended to give both unanimity instructions requested. The court also declined to require the prosecution "at this particular moment to define any specific conduct with regards to each of [the] counts," although it emphasized that "the unanimity instructions

15

make[] it clear that there [have] to be counts that are different from one another or facts different for each count."

Toward the end of trial, the trial court reaffirmed that it intended to give CALCRIM Nos. 3500 and 3501 and offered the parties a chance to respond. Justice's trial counsel stated that "the law obviously supports these instructions," but he nonetheless argued that they violated his client's right to due process because they did not "force the jury to do anything except say yes, it's true. [Justice] did it 50 times, so he's guilty of everything." Counsel never suggested that giving both instructions was improper.

As given, CALCRIM Nos. 3500 and 3501 both listed all the counts with which Justice was charged, which each occurred "sometime during" a time period that was also specified. Both instructions then stated, "The People have presented evidence of more than one act to prove that the defendant committed" the offenses. CALCRIM No. 3500 continued, "You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed." CALCRIM No. 3501 continued, "You must not find the defendant guilty unless: [¶] 1. You all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed for each offense; [¶] OR [¶] 2. You all agree that the People have proved that the defendant committed all the acts alleged to have occurred during this time period and have proved that the defendant committed at least the number of offenses charged." In other words, the instructions were basically identical except that CALCRIM No. 3501 gave a second option for complying with the unanimity requirement.

Justice claims the trial court erred by giving both unanimity instructions because they are "mutually exclusive" and "contradict each

16

other."  He observes that whereas CALCRIM No. 3500 required the jurors to all agree that he "committed at least one of these acts" and "agree on which act he committed," CALCRIM No. 3501's first option required them all to agree that he "committed at least one of these acts" and "agree on which act he committed *for each offense*."  (Italics added.)  According to Justice, the absence of the italicized language in CALCRIM No. 3500 allowed the jury to convict him of all 12 counts even if it agreed only that he committed "one act."  Thus, even though he admits that CALCRIM No. 3501 "correctly stated" the law on "unanimity for each offense, the fact that [CALCRIM No. 3500] was stated first and never corrected means that [he] may have been illegally convicted of 11 additional counts."

Again, we review this claim of instructional error de novo, " 'consider[ing] the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled' " in the way Justice identifies. (*People v. Tran*, *supra*, 13 Cal.5th at p. 1199; *People v. Mitchell*, *supra*, 7 Cal.5th at p. 579.)  We " ' "assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." ' "  (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)  In addition, " ' "any theoretical possibility of confusion [may be] diminished by the parties' closing arguments." ' "  (*People v. Lua* (2017) 10 Cal.App.5th 1004, 1013.)

To begin with, the Attorney General argues that Justice forfeited this claim by failing to raise it below.  Justice objected to the unanimity instructions generally, on the ground that the prosecution should be required to elect an act for each count, but he never contended that CALCRIM No. 3500 misstated the law or that it was improper to give both it and CALCRIM No. 3501.  Indeed, his trial counsel stated that the instructions were legally supported.  Nonetheless, we will consider Justice's claim on the

17

merits, as he argues that the error undermines all but one of his convictions. (See § 1259.)

CALCRIM No. 3500 is the standard unanimity instruction given when " 'the evidence indicates the jurors might disagree as to the particular act [the] defendant committed.' " (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 555.) CALCRIM No. 3501, which applies " 'when there is no reasonable likelihood of juror disagreement as to particular acts, and the only question is whether or not the defendant in fact committed all of them,' " is often given "in cases involving sexual molestation of children and repeated identical offenses." (*Fernandez*, at pp. 555–557.) CALCRIM No. 3501 is normally given as to multiple offenses and thus contains the phrase "for each offense," whereas CALCRIM No. 3500 is generally given as to one offense and does not contain that phrase. (CALCRIM Nos. 3500 & 3501.) The bench notes indicate that the two instructions are alternative to each other and should not be given together. (Jud. Council of Cal. Criminal Jury Inst. (2025) Bench Notes to CALCRIM Nos. 3500 & 3501, pp. 2287–2288, 2290–2291.)

We conclude it is not reasonably likely the jury interpreted CALCRIM No. 3500 to permit it to convict Justice of 12 counts based on a single act. As mentioned, the version of the instruction given began by identifying all of the counts and the date ranges during which they were allegedly committed. Some of the date ranges were the same or overlapped, but others were completely different. For example, the first count of forcible rape was identified as occurring between June 1, 2015, and August 28, 2015, but four out of the five other counts of that crime were identified as occurring no earlier than August 28, 2016. Thus, no reasonable juror would have believed it was permissible to convict Justice of all the counts based on a single act

18

that could not possibly have happened during each of the identified time periods.

Other instructions further conveyed that each count required a separate act. CALCRIM No. 3501's first option, which was essentially the same as CALCRIM No. 3500's only option, required the jury to agree on a single act "for each offense." We agree with the Attorney General that the jury would have understood the quoted phrase applied "by implication" to the otherwise identical requirement in CALCRIM No. 3500. And CALCRIM No. 3515 informed the jury, "Each of the counts charged in this case is a separate crime. You must consider each count separately and return a separate verdict for each one." This instruction cannot reasonably be read to permit the jury to decide that Justice committed one criminal act and then convict him of all the charges.

The prosecutor's closing argument also confirmed that the jury could not rely on a single act to convict Justice of all 12 counts. Addressing the six counts of lewd acts, the prosecutor told the jury, "[Y]ou can all agree that all of the acts happened and that . . . it happened at least the number of times that we have charges. . . . Or, you can match up each individual act that was testified to, and once you do that six times and you guys all agree on the act, then it's done." Later, she urged the jurors to apply CALCRIM No. 3501's second option, telling them that if they believed all of the sexual touching happened, "then the question is, did it happen at least six times while [Doe] was 14 or 15." Otherwise, they could use the first option by "agree[ing] on the act" and then "match[ing] it with the number of charges. So you do it six times."

Similarly, the prosecutor made clear that the jury could not convict Justice of the six counts of forcible rape based on a single act. She explained

19

that each count charged represented one "rape for each year. One when [Doe was] 14, one when she's 15, once when she's 16, one when she is 17, and so on." Though the prosecutor did not reiterate her explanation of how to apply the unanimity instruction as to these counts, her statements made clear that each count of rape was alleged to occur when Doe was a different age, requiring a finding of six different acts.

In short, considering the record as a whole, we conclude there is no reasonable likelihood that the jury interpreted CALCRIM No. 3500 as Justice contends. As a result, we reject this claim of instructional error as well.

D. *Justice Fails to Demonstrate Error Involving the Date Range for the Counts of Lewd Acts.*

Justice was convicted of six counts of lewd acts against a "child of 14 or 15 years" under section 288, subdivision (c)(1). According to him, these convictions must be reversed because the jury was instructed on a date range that included August 28, 2016, the day Doe turned 16. We are not persuaded.

The information alleged that all six counts of lewd acts occurred on or between June 1, 2015, and August 28, 2016. Likewise, various jury instructions, including the unanimity instructions, identified this date range for these counts. The jury was instructed on the elements of lewd acts under CALCRIM No. 1112, which did not include this date range. CALCRIM No. 1112 informed the jury that to convict Justice, it had to find that "[t]he child was 14 or 15 years old at the time of the act." The instruction also stated that "a person becomes one year older as soon as the first minute of [the person's] birthday has begun."

Justice did not raise the issue of including the day Doe turned 16 until his motion for a new trial. In denying the motion, the trial court indicated that although the date range was inaccurate in this respect, CALCRIM

20

No. 1112 "ma[de] it very clear" to the jury that it could not convict Justice of a lewd act unless Doe was 14 or 15 at the time of the act.

On appeal, Justice cursorily claims that because Doe's sixteenth birthday was identified as part of the time period when the lewd acts occurred, "[i]t is possible that [he] was convicted based upon activity done when . . . Doe was 16." But he states that the standard of review is the one applicable to "any ruling by a trial court on the admissibility of evidence," and the only cases he cites are those establishing that standard. In other words, Justice offers absolutely no legal authority to support his claim that the lewd-acts convictions must be reversed, whether due to instructional error or otherwise. Accordingly, the claim is forfeited. (See *Lee v. Kim* (2019) 41 Cal.App.5th 705, 721 [appellant's failure to support point " ' "with reasoned argument and citations to authority" ' " forfeits it].)

Even if the claim was not forfeited, we would reject it for the same reason the trial court did. The jury was informed under CALCRIM No. 1112 that (1) an element of the lewd-acts charges was that Doe was 14 or 15 when the crime occurred and (2) she turned a year older on the first minute of her birthday. Thus, there is no reasonable likelihood that the jury believed it could convict Justice based on an act that happened August 28, 2016, the day Doe turned 16, despite the date's inclusion in the time period alleged. (See *People v. Tran*, *supra*, 13 Cal.5th at p. 1199.) No reversible error occurred.

E.     *There Was No Cumulative Error.*

Finally, Justice claims that the four errors he identifies were cumulatively prejudicial, even if they do not individually require reversal. As discussed, however, we conclude that he failed to demonstrate that any of these errors occurred. Thus, his claim of cumulative error likewise fails.

## III.
### DISPOSITION

The judgment is affirmed.  The trial court is directed to prepare an amended abstract of judgment consistent with footnote two of this opinion and forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.

_____

Humes, P. J.



WE CONCUR:




_____

Langhorne Wilson, J.




_____

Smiley, J.




*People v. Justice*  A169403